# THE CHINESE EXCLUSION CASE.

## CHAE CHAN PING v. UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 1446. Argued March 28, 29, 1889. — Decided May 13, 1889.

In their relations with foreign governments and their subjects or citizens, the United States are a nation, invested with the powers which belong to independent nations.

So far as a treaty made by the United States with any foreign power can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification or appeal. *The Head Money Cases*, 112 U. S. 580, and *Whitney* v. *Robertson*, 124 U. S. 190, followed.

The abrogation of a treaty, like the repeal of a law, operates only on future transactions, leaving unaffected those executed under it previous to the abrogation.

The rights and interests created by a treaty, which have become so vested that its expiration or abrogation will not destroy or impair them, are such as are connected with and lie in property, capable of sale and transfer or other disposition, and not such as are personal and untransferable in their character.

The power of the legislative department of the government to exclude aliens from the United States is an incident of sovereignty, which cannot be surrendered by the treaty making power.

The act of October 1, 1888, 25 Stat. 504, c. 1064, excluding Chinese laborers from the United States, was a constitutional exercise of legislative power, and, so far as it conflicted with existing treaties between the United States and China, it operated to that extent to abrogate them as part of the municipal law of the United States.

A certificate issued to a Chinese laborer under the fourth and fifth sections of the act of May 6, 1882, 22 Stat. 58, c. 126, as amended July 5, 1884, 23 Stat. 115, c. 220, conferred upon him no right to return to the United States of which he could not be deprived by a subsequent act of Congress.

The history of Chinese immigration into the United States stated, together with a review of the treaties and legislation affecting it.

THE court stated the case as follows in its opinion:

This case comes before us on appeal from an order of the Circuit Court of the United States for the Northern District of California refusing to release the appellant, on a writ of *habeas corpus*, from his alleged unlawful detention by Captain Walker,

master of the steamship Belgic, lying within the harbor of San Francisco. The appellant is a subject of the Emperor of China and a laborer by occupation. He resided at San Francisco, California, following his occupation, from some time in 1875 until June 2, 1887, when he left for China on the steamship Gaelic, having in his possession a certificate, in terms entitling him to return to the United States; bearing date on that day, duly issued to him by the collector of customs of the port of San Francisco, pursuant to the provisions of section four of the restriction act of May 6, 1882, as amended by the act of July 5, 1884. 22 Stat. 58, c. 126; 23 Stat. 115, c. 220.

On the 7th of September, 1888, the appellant, on his return to California, sailed from Hong Kong in the steamship Belgic, which arrived within the port of San Francisco on the 8th of October following. On his arrival he presented to the proper custom-house officers his certificate, and demanded permission to land. The collector of the port refused the permit, solely on the ground that under the act of Congress, approved October 1, 1888, supplementary to the restriction acts of 1882 and 1884, the certificate had been annulled and his right to land abrogated, and he had been thereby forbidden again to enter the United States. 25 Stat. 504, c. 1064. The captain of the steamship, therefore, detained the appellant on board the steamer. Thereupon a petition on his behalf was presented to the Circuit Court of the United States for the Northern District of California, alleging that he was unlawfully restrained of his liberty, and praying that a writ of *habeas corpus* might be issued directed to the master of the steamship, commanding him to have the body of the appellant, with the cause of his detention, before the court at a time and place designated, to do and receive what might there be considered in the premises. A writ was accordingly issued, and in obedience to it the body of the appellant was produced before the court. Upon the hearing which followed, the court, after finding the facts substantially as stated, held as conclusions of law that the appellant was not entitled to enter the United States, and was not unlawfully restrained of his liberty, and ordered that he be remanded to the custody of the master of the steamship from

which he had been taken under the writ. From this order an appeal was taken to this court.

Mr. George Hoadly and Mr. James C. Carter argued the case orally for appellant. They also filed a brief, prepared by Mr. Hoadly, citing: Woolsey, Internat. Law, 5th ed. § 63; Field, Code of Internat. Law, § 318; Bluntschli, Das Moderne Voelkerrecht der Civiliserten Staaten, § 381; Head Money Cases, 112 U. S. 580, 598; Chew Heong v. United States, 112 U. S. 536, 592; Society for the Propagation of the Gospel v. New Haven, 8 Wheat. 464, 493; McClurg v. Kingsland, 1 How. 206; Townsley v. Sumrall, 2 Pet. 182; Langdell on Contracts, 2d ed. 62; Poste's Gaius, Lib. 3, 372; Dig. 9, 5, 15, 22, 25; Sandar's Justinian, Lib. 3, Tit. 14, 2d ed. p. 419; 1 Parsons on Contracts, 429; Thomas v. Thomas, 202 Q. B. (N. S.) 851; Dartmouth College v. Woodward, 4 Wheat. 655; Shuey v. United States, 92 U. S. 73; Loring v. Boston, 7 Met. 409; Janvrin v. Exeter, 48 N. H. 83; 2 Bl. Com. 37; Bank of Augusta v. Earle, 13 Pet. 595; 4 Madison's Writings, 478–480, 526; Virginia Report of 1799–1800, 204–205, Richmond, 1850; Fletcher v. Peck, 6 Cranch, 87; Knapp v. Thomas, 39 Ohio St. 377, 381; United States v. American Bell Telephone Co., 128 U. S. 450; Von Holst on Const. 40; 9 Kentucky Resolutions of 1798, Jefferson's Writings, 466, Riker's ed. 1853–6; Virginia Resolutions of 1798, 4 Elliot's Debates, 528, 531; Mass. Resolutions, Feb. 30, 1799; N. H. Resolutions, June 15, 1799; The Debates on the Virginia Resolutions in the Virginia Legislature; The Debates on the Alien and Sedition Law in Congress; Story, Conflict Laws, §§ 41, 46; Munn v. Illinois, 94 U. S. 142; Mugler v. Kansas, 123 U. S. 661; Barbier v. Connolly, 113 U. S. 31; New York v. Miln, 11 Pet. 102, 139; United States v. Cruikshank, 92 U. S. 542; Presser v. Illinois, 116 U. S. 266; Magna Charta; Dauphin v. Key, McArthur & Mackay, 203; 1 Hare Const. Law, 550; Cummings v. State, 4 Wall. 277; Ex parte Garland, 4 Wall. 377; Pierce v. Carskadon, 16 Wall. 234; Blair v. Ridgly, 41 Missouri, 63; S. C. 97 Am. Dec. 248; In re Yung Sing Hee, 36 Fed. Rep. 437; In re Look Tin Sing, 21 Fed. Rep. 905, 910; In re Wy Shing, 36 Fed. Rep. 553; Kilham v. Ward, 2 Mass. 236.

*Mr. Carter* also filed a brief "designed to present in a short compass the main propositions elaborated and illustrated in the more copious brief prepared by Mr. Hoadly."

I. It appears by the record that the appellant when brought before the court below in pursuance of the writ of *habeas corpus* was restrained of his liberty in not being allowed to land from the steamer Belgic — in other words, that he was *imprisoned* upon that vessel. The judgment of the court was that he had no right to land, and was therefore not unlawfully restrained of his liberty. If he had such right, it will not be denied that the judgment was erroneous and should be reversed.

II. Inasmuch as it did not appear to the court below that the petitioner was held under any sentence, judgment, writ or other judicial process of any court, it became instantly manifest that he was deprived of his liberty *without due process of law*, unless some other matter appeared showing that he was not entitled to the protection of the common constitutional safeguard to personal liberty.

(1) It is, at least, in general true that whenever upon the hearing, upon a return to a writ of *habeas corpus* any man is held a prisoner upon any other ground or pretence than the command of some writ or other judicial process, order, or judgment, he must instantly be discharged. It is only by the authority of *law* manifested through the mandate of some *court* or *judicial* officer that one man can be held a prisoner by another.

(2) There is no distinction in this respect, between citizens and the subjects of other nations. Liberty is the birthright and inalienable possession of all men, as *men*. For this proposition an American lawyer disdains to cite authority. Neither the fundamental law of the United States, nor of any one of the States, recognizes any such distinction.

III. The special matter which the judgment of the court below determined as sufficient to take the case of the appellant out of the operation of the principles above mentioned, was, that the appellant was a Chinese laborer who had been a resident of the United States, but who had departed there-

from, and was, under the provisions of the act of Congress, approved October 1st, 1888, forbidden to return to the United States. This matter was wholly insufficient to justify the detention of the appellant.

(1) The inherent right of a sovereign power to prohibit, even in time of peace, the entry into its territories of the subjects of a foreign state will not be denied. But the United States, while a sovereign government, is yet one which can exercise only those powers of sovereignty which are enumerated in and delegated by the instrument which created it, and such other incidental powers as are necessary and proper in order to carry into execution those thus enumerated. That the power of prohibition above mentioned is one, in terms, delegated, will not be asserted. That it is necessary or proper in order to carry into execution some power expressly delegated may be asserted, but is by no means conceded. Such a proposition may well await the solemn determination of this court when some case arises which depends solely upon it. Its establishment is not necessary in order to maintain the case of the appellant.

(2) Whatever power Congress may have to prohibit the immigration of other foreign citizens or subjects, it had none to prohibit the *return* to this country of the appellant. He had a *vested right* to return, which could not be taken from him by any exercise of mere *legislative* power.

(a) That he had a lawful right to *be* in the United States when the writ issued cannot be denied. He had been a peaceable resident of California for twelve years preceding June 2d, 1887. He had come here under a treaty between the United States and his own nation, which declared "the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and immigration of their citizens and subjects respectively from the one country to the other for purposes of curiosity, of trade, or as *permanent residents*." Burlingame Treaty, Art. V. He could not have been *ejected* from the United States by any mere legislation. However the power "to regulate commerce with foreign nations" may authorize congressional

legislation to prevent the *entry* of foreign subjects, no one, it is believed, will assert that any power is conferred upon Congress to command them to surrender any residence they may have acquired under such invitations and guaranties, and *depart* from the country. The "Alien Law" of 1798 has been feebly sustained as an exercise of lawful power; but that did not assert the right of compelling an alien *friend* to leave the country, and the only defence of it which has been allowed as plausible was that it was a measure in preparation for *anticipated war*, and, therefore, an exercise of the war power.

(*b*) If, therefore, the appellant had a *right of residence* here, it is extremely clear that it is a right which could not be taken away by mere *legislation*. Such taking away could not be effected without first taking away his liberty. It is very certain that he never himself surrendered the right, unless his departure from the country under all the guaranties supplied by the acts of 1882 and 1884 is to be deemed such a surrender; and such an assertion may safely be left unanswered. It follows, therefore, that the appellant had the right to land when the writ issued.

(*c*) It will be observed that the right of the appellant *to return* to the United States is based, so far as above insisted upon, not upon any *contract* between him and that government, but upon a title or right to *be* in that country when the writ issued — a title or right fully acquired by, and vested in him by his coming here under the permission of the laws and treaties under which he came. It was granted to him by *law;* but, when once granted, could not be taken away by mere law, for two reasons: (1), because it was a *valuable* right like an estate in lands, and the taking of it away would necessarily involve the taking away of his *liberty;* and (2), because, whatever sovereign powers may, in general, do in the way of banishing aliens, no power to do that has been delegated to the Congress of the United States.

(3) But another, and perhaps more clearly demonstrable basis for the asserted right of the appellant to return, is that which refers the acquisition of it to a *contract*.

That there was a contract between the appellant and the

United States by which the latter became bound to permit his return is very clear.

The provisions of acts of 1882 and 1884 (22 Stat. 58; 1884, 23 Stat. 115) contained an *offer* on the part of the United States to every Chinese laborer then in this country, if he should leave the country and comply with the conditions therein for such case specified, to permit him to return. That offer was accepted and the conditions were fully complied with by the appellant. This created a perfect contract, binding upon the United States.

(*a*) The *consideration* was perfect. It was that the appellant would give up his actual residence in the United States, with all the rights and benefits which such residence conferred upon him, undertake the expense and hazard of a journey abroad, and procure certain documentary evidence. The circumstance that these things were of no benefit to the United States is wholly immaterial. The *sacrifice* by the appellant completely answers the conception of consideration.

(*b*) As it was not a case of *mutual* promises, but the promise was only on the side of the United States, it was a *unilateral* contract, and the promise was one which would not become binding until the full *performance* of the consideration. It was fully performed.

(4) The contract being thus fully *executed* by the appellant, he *completely acquired* the right which it was agreed he should have upon its execution. No *muniment* of title was necessary in order to complete the investiture. It was as perfectly vested as the title to real property is vested by the execution and delivery of a deed.

(5) It may possibly be urged that the making of contracts are *executive* acts, not within the ordinary contemplation of legislation, and that the laws in question should not be deemed as containing *offers*, but as being pieces of simple legislation, subject to repeal at any time, and that all persons should take notice of this fact and consider that they acted at their peril; and that in the present case the Chinese laborers were bound to know that in leaving the country they took the peril of a repeal of the laws. Such a suggestion would be an entire perversion of the real fact.

(*a*) The making through the instrumentality of laws of *offers* for contracts is perfectly familiar. Laws making provision for sales of public lands, for giving rewards for the apprehension of criminals, for the furnishing of supplies to the public, and for the construction of public works, are common instances. That offers *may* be thus made is plain; the only question in a particular case is whether an offer was *intended.*

(*b*) States, as well as individuals, are moral agents, and the common rules of morality and good faith are as binding upon them as upon individuals; and when one man declares to another that he will, in case such other will do or suffer a certain thing, bestow upon the latter an *advantage,* and thus tempt him to act or suffer upon the faith of the promise, he will not be heard to say that he did not *intend* to make an offer.

(*c*) The question is, *was it contemplated* by the acts of Congress of 1882 and 1884 that the Chinese laborers would act upon the assurance therein contained? If it was, those acts must be deemed to have intended the making of offers. The contrary supposal would impute to Congress the deliberate intention of holding out expectations which it knew would be acted upon without meaning to make them good.

(*d*) The answer to the above question cannot be doubtful. It declares that the exclusion from the country *shall not apply* to Chinese laborers now resident in it and who may wish to go away with intent to return; provides documentary evidence establishing their indentity in the shape of a formal certificate; and declares that such certificate "*shall entitle* the Chinese laborer to whom the same is issued to return to, and re-enter the United States." It is not in this court that any argument is necessary to show that these statutes *contemplate* that individuals affected by them will act upon the faith of the assurance which they contain.

(6) If we have succeeded in establishing that the appellant had a vested right to return, acquired by *contract,* we need spend no time in asserting that it could not be taken away by a mere exercise of legislative power. *The Sinking Fund Cases,* 99 U. S. 700.

(7) There are, indeed, exceptions to the doctrines above mentioned. The existence of war, or pestilence, might have justified the refusal of permission to land. Anything which, by the rules of law, destroys or suspends the operations of a contract, would have been effective upon the one in question. But no such ground is suggested in the present case. The exclusion act of 1888, and that alone, was invoked by way of justification.

IV. The act of 1888, so far as respects Chinese laborers of the class of which the appellant is one, is unconstitutional, as being a bill of attainder, or *ex post facto* law. If the appellant had a right to return, the depriving him of such right is *punishment*, and this cannot be inflicted except by judicial sentence.

*Mr. Harvey S. Brown* and *Mr. Thomas D. Riordan* also filed a brief for appellant.

*Mr. Solicitor General*, *Mr. G. A. Johnson*, Attorney General of California, *Mr. Stephen M. White* and *Mr. John F. Swift* for appellees.

MR. JUSTICE FIELD delivered the opinion of the court.

The appeal involves a consideration of the validity of the act of Congress of October 1, 1888, prohibiting Chinese laborers from entering the United States who had departed before its passage, having a certificate issued under the act of 1882 as amended by the act of 1884, granting them permission to return. The validity of the act is assailed as being in effect an expulsion from the country of Chinese laborers, in violation of existing treaties between the United States and the government of China, and of rights vested in them under the laws of Congress.

It will serve to present with greater clearness the nature and force of the objections to the act, if a brief statement be made of the general character of the treaties between the two countries and of the legislation of Congress to carry them into execution.

The first treaty between the United States and the Empire of China was concluded on the 3d of July, 1844, and ratified in December of the following year. 8 Stat. 592. Previous to that time there had been an extensive commerce between the two nations, that to China being confined to a single port. It was not, however, attended by any serious disturbances between our people there and the Chinese. In August, 1842, as the result of a war between England and China, a treaty was concluded stipulating for peace and friendship between them, and, among other things, that British subjects, with their families and establishments, should be allowed to reside for the purpose of carrying on mercantile pursuits at the five principal ports of the empire. 6 Hertslet's Commercial Treaties, 221; 3 Nouveau Recueil Général de Traités (1842), 484. Actuated by a desire to establish by treaty friendly relations between the United States and the Chinese Empire, and to secure to our people the same commercial privileges which had been thus conceded to British subjects, Congress placed at the disposal of the President the means to enable him to establish future commercial relations between the two countries "on terms of national equal reciprocity." Act of March, 1843, c. 90, 5 Stat. 624. A mission was accordingly sent by him to China, at the head of which was placed Mr. Caleb Cushing, a gentleman of large experience in public affairs. He found the Chinese government ready to concede by treaty to the United States all that had been reluctantly yielded to England through compulsion. As the result of his negotiations the treaty of 1844 was concluded. It stipulated, among other things, that there should be a "perfect, permanent and universal peace, and a sincere and cordial amity" between the two nations; that the five principal ports of the empire should be opened to the citizens of the United States, who should be permitted to reside with their families and trade there, and to proceed with their vessels and merchandise to and from any foreign port and either of said five ports; and while peaceably attending to their affairs should receive the protection of the Chinese authorities. Senate Document No. 138, 28th Cong. 2d Sess.

The treaty between England and China did not have the effect of securing permanent peace and friendship between those countries. British subjects in China were often subjected not only to the violence of mobs, but to insults and outrages from local authorities of the country, which led to retaliatory measures for the punishment of the aggressors. To such an extent were these measures carried, and such resistance offered to them, that in 1856 the two countries were in open war. England then determined, with the coöperation of France, between which countries there seemed to be perfect accord, to secure from the government of China, among other things, a recognition of the right of other powers to be represented there by accredited ministers, an extension of commercial intercourse with that country, and stipulations for religious freedom to all foreigners there, and for the suppression of piracy. England requested of the President the concurrence and active co-operation of the United States similar to that which France had accorded, and to authorize our naval and political authorities to act in concert with the allied forces. As this proposition involved a participation in existing hostilities, the request could not be acceded to, and the Secretary of State in his communication to the English government explained that the war-making power of the United States was not vested in the President but in Congress, and that he had no authority, therefore, to order aggressive hostilities to be undertaken. But as the rights of citizens of the United States might be seriously affected by the results of existing hostilities, and commercial intercourse between the United States and China be disturbed, it was deemed advisable to send to China a minister plenipotentiary to represent our government and watch our interests there. Accordingly, Mr. William B. Reed, of Philadelphia, was appointed such minister, and instructed, whilst abstaining from any direct interference, to aid by peaceful coöperation the objects the allied forces were seeking to accomplish. Senate Document No. 47, 35th Cong. 1st Sess. Through him a new treaty was negotiated with the Chinese government. It was concluded in June, 1858, and ratified in August of the following year.

12 Stat. 1023. It reiterated the pledges of peace and friend-
ship between the two nations, renewed the promise of protec-
tion to all citizens of the United States in China peaceably
attending to their affairs, and stipulated for security to Chris-
tians in the profession of their religion. Neither the treaty of
1844, nor that of 1858, touched upon the migration and emi-
gration of the citizens and subjects of the two nations respec-
tively from one country to the other. But in 1868 a great
change in the relations of the two nations was made in that
respect. In that year a mission from China, composed of dis-
tinguished functionaries of that empire, came to the United
States with the professed object of establishing closer rela-
tions between the two countries and their peoples. At its
head was placed Mr. Anson Burlingame, an eminent citizen of
the United States, who had at one time represented this coun-
try as commissioner to China. He resigned his office under
our government to accept the position tendered to him by the
Chinese government. The mission was hailed in the United
States as the harbinger of a new era in the history of China
— as the opening up to free intercourse with other nations
and peoples a country that for ages had been isolated and
closed against foreigners, who were allowed to have inter-
course and to trade with the Chinese only at a few designated
places; and the belief was general, and confidently expressed,
that great benefits would follow to the world generally and
especially to the United States. On its arrival in Washington,
additional articles to the treaty of 1858 were agreed upon, which
gave expression to the general desire that the two nations and
their peoples should be drawn closer together. The new arti-
cles, eight in number, were agreed to on the 28th of July,
1868, and ratifications of them were exchanged at Pekin in
November of the following year. 16 Stat. 739. Of these
articles the 5th, 6th and 7th are as follows:

"ARTICLE V. The United States of America and the Emperor
of China cordially recognize the inherent and inalienable right
of man to change his home and allegiance, and also the
mutual advantage of the free migration and emigration of
their citizens and subjects respectively from the one country

to the other for purposes of curiosity, of trade, or as permanent residents. The high contracting parties, therefore, join in reprobating any other than an entirely voluntary emigration for these purposes. They consequently agree to pass laws making it a penal offence for a citizen of the United States or Chinese subjects to take Chinese subjects either to the United States or to any other foreign country, or for a Chinese subject or citizen of the United States to take citizens of the United States to China or to any other foreign country without their free and voluntary consent, respectively.

"ARTICLE VI. Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities or exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation. And, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities and exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation. But nothing herein contained shall be held to confer naturalization upon citizens of the United States in China, nor upon the subjects of China in the United States.

"ARTICLE VII. Citizens of the United States shall enjoy all the privileges of the public educational institutions under the control of the government of China; and, reciprocally, Chinese subjects shall enjoy all the privileges of the public educational institutions under the control of the government of the United States, which are enjoyed in the respective countries by the citizens or subjects of the most favored nation. The citizens of the United States may freely establish and maintain schools within the Empire of China at those places where foreigners are by treaty permitted to reside; and, reciprocally, Chinese subjects may enjoy the same privileges and immunities in the United States."

But notwithstanding these strong expressions of friendship and good will, and the desire they evince for free intercourse, events were transpiring on the Pacific Coast which soon dissipated the anticipations indulged as to the benefits to follow the immigration of Chinese to this country. The previous

treaties of 1844 and 1858 were confined principally to mutual declarations of peace and friendship and to stipulations for commercial intercourse at certain ports in China and for protection to our citizens whilst peaceably attending to their affairs. It was not until the additional articles of 1868 were adopted that any public declaration was made by the two nations that there were advantages in the free migration and emigration of their citizens and subjects respectively from one country to the other; and stipulations given that each should enjoy in the country of the other, with respect to travel or residence, the "privileges, immunities, and exemptions" enjoyed by citizens or subjects of the most favored nation. Whatever modifications have since been made to these general provisions have been caused by a well-founded apprehension — from the experience of years — that a limitation to the immigration of certain classes from China was essential to the peace of the community on the Pacific Coast, and possibly to the preservation of our civilization there. A few words on this point may not be deemed inappropriate here, they being confined to matters of public notoriety, which have frequently been brought to the attention of Congress. Report of Committee of H. R. No. 872, 46th Cong. 2d Sess.

The discovery of gold in California in 1848, as is well known, was followed by a large immigration thither from all parts of the world, attracted not only by the hope of gain from the mines, but from the great prices paid for all kinds of labor. The news of the discovery penetrated China, and laborers came from there in great numbers, a few with their own means, but by far the greater number under contract with employers, for whose benefit they worked. These laborers readily secured employment, and, as domestic servants, and in various kinds of out-door work, proved to be exceedingly useful. For some years little opposition was made to them except when they sought to work in the mines, but, as their numbers increased, they began to engage in various mechanical pursuits and trades, and thus came in competition with our artisans and mechanics, as well as our laborers in the field.

The competition steadily increased as the laborers came in

crowds on each steamer that arrived from China, or Hong Kong, an adjacent English port. They were generally industrious and frugal. Not being accompanied by families, except in rare instances, their expenses were small; and they were content with the simplest fare, such as would not suffice for our laborers and artisans. The competition between them and our people was for this reason altogether in their favor, and the consequent irritation, proportionately deep and bitter, was followed, in many cases, by open conflicts, to the great disturbance of the public peace.

The differences of race added greatly to the difficulties of the situation. Notwithstanding the favorable provisions of the new articles of the treaty of 1868, by which all the privileges, immunities, and exemptions were extended to subjects of China in the United States which were accorded to citizens or subjects of the most favored nation, they remained strangers in the land, residing apart by themselves, and adhering to the customs and usages of their own country. It seemed impossible for them to assimilate with our people or to make any change in their habits or modes of living. As they grew in numbers each year the people of the coast saw, or believed they saw, in the facility of immigration, and in the crowded millions of China, where population presses upon the means of subsistence, great danger that at no distant day that portion of our country would be overrun by them unless prompt action was taken to restrict their immigration. The people there accordingly petitioned earnestly for protective legislation.

In December, 1878, the convention which framed the present constitution of California, being in session, took this subject up, and memorialized Congress upon it, setting forth, in substance, that the presence of Chinese laborers had a baneful effect upon the material interests of the State, and upon public morals; that their immigration was in numbers approaching the character of an Oriental invasion, and was a menace to our civilization; that the discontent from this cause was not confined to any political party, or to any class or nationality, but was well-nigh universal; that they retained the habits and customs of their own country, and in fact constituted a

Chinese settlement within the State, without any interest in our country or its institutions; and praying Congress to take measures to prevent their further immigration. This memorial was presented to Congress in February, 1879.

So urgent and constant were the prayers for relief against existing and anticipated evils, both from the public authorities of the Pacific Coast and from private individuals, that Congress was impelled to act on the subject. Many persons, however, both in and out of Congress, were of opinion that so long as the treaty remained unmodified, legislation restricting immigration would be a breach of faith with China. A statute was accordingly passed appropriating money to send commissioners to China to act with our minister there in negotiating and concluding by treaty a settlement of such matters of interest between the two governments as might be confided to them. 21 Stat. 133, c. 88. Such commissioners were appointed, and as the result of their negotiations the supplementary treaty of November 17, 1880, was concluded and ratified in May of the following year. 22 Stat. 826. It declares in its first article that "Whenever, in the opinion of the Government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country or of any locality within the territory thereof, the Government of China agrees that the Government of the United States may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a character only as is necessary to enforce the regulation, limitation, or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse." In its second article it declares that "Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States shall

be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities and exemptions which are accorded to the citizens and subjects of the most favored nation."

The government of China thus agreed that notwithstanding the stipulations of former treaties, the United States might regulate, limit, or suspend the coming of Chinese laborers, or their residence therein, without absolutely forbidding it, whenever in their opinion the interests of the country, or of any part of it, might require such action. Legislation for such regulation, limitation, or suspension was entrusted to the discretion of our government, with the condition that it should only be such as might be necessary for that purpose, and that the immigrants should not be maltreated or abused. On the 6th of May, 1882, an act of Congress was approved, to carry this supplementary treaty into effect. 22 Stat. 58, c. 126. It is entitled "An act to execute certain treaty stipulations relating to Chinese." Its first section declares that after ninety days from the passage of the act, and for the period of ten years from its date, the coming of Chinese laborers to the United States is suspended, and that it shall be unlawful for any such laborer to come, or, having come, to remain within the United States. The second makes it a misdemeanor, punishable by fine, to which imprisonment may be added, for the master of any vessel knowingly to bring within the United States from a foreign country, and land, any such Chinese laborer. The third provides that those two sections shall not apply to Chinese laborers who were in the United States November 17, 1880, or who should come within ninety days after the passage of the act. The fourth declares that, for the purpose of identifying the laborers who were here on the 17th of November, 1880, or who should come within the ninety days mentioned, and to furnish them with "the proper evidence" of their right to go from and come to the United States, the "collector of customs of the district from which any such Chinese laborer shall depart from the United States shall, in person or by deputy, go on board each vessel having on board any such Chinese laborer and cleared or about to sail

from his district for a foreign port, and on such vessel make a list of all such Chinese laborers, which shall be entered in registry books to be kept for that purpose, in which shall be stated the name, age, occupation, last place of residence, physical marks or peculiarities and all facts necessary for the identification of each of such Chinese laborers, which books shall be safely kept in the custom-house;" and each laborer thus departing shall be entitled to receive, from the collector or his deputy, a certificate containing such particulars, corresponding with the registry, as may serve to identify him. "The certificate herein provided for," says the section, "shall entitle the Chinese laborer to whom the same is issued to return to and re-enter the United States upon producing and delivering the same to the collector of customs of the district at which such Chinese laborer shall seek to re-enter."

The enforcement of this act with respect to laborers who were in the United States on November 17, 1880, was attended with great embarrassment, from the suspicious nature, in many instances, of the testimony offered to establish the residence of the parties, arising from the loose notions entertained by the witnesses of the obligation of an oath. This fact led to a desire for further legislation restricting the evidence receivable, and the amendatory act of July 5, 1884, was accordingly passed. 23 Stat. 115, c. 220. The committee of the House of Representatives on foreign affairs, to whom the original bill was referred, in reporting it back, recommending its passage, stated that there had been such manifold evasions, as well as attempted evasions, of the act of 1882, that it had failed to meet the demands which called it into existence. Report in H. R. No. 614, 48th Cong. 1st Sess. To obviate the difficulties attending its enforcement the amendatory act of 1884 declared that the certificate which the laborer must obtain "shall be the only evidence permissible to establish his right of re-entry" into the United States.

This act was held by this court not to require the certificate from laborers who were in the United States on the 17th of November, 1880, who had departed out of the country before May 6, 1882, and remained out until after July 5, 1884.

*Chew Heong* v. *United States*, 112 U. S. 536. The same difficulties and embarrassments continued with respect to the proof of their former residence. Parties were able to pass successfully the required examination as to their residence before November 17, 1880, who, it was generally believed, had never visited our shores. To prevent the possibility of the policy of excluding Chinese laborers being evaded, the act of October 1, 1888, the validity of which is the subject of consideration in this case, was passed. It is entitled "An act a supplement to an act entitled 'An act to execute certain treaty stipulations relating to Chinese,' approved the sixth day of May, eighteen hundred and eighty-two." 25 Stat. 504, c. 1064. It is as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the passage of this act, it shall be unlawful for any Chinese laborer who shall at any time heretofore have been, or who may now or hereafter be, a resident within the United States, and who shall have departed, or shall depart therefrom, and shall not have returned before the passage of this act, to return to, or remain in, the United States.

"SEC. 2. That no certificates of identity provided for in the fourth and fifth sections of the act to which this is a supplement shall hereafter be issued; and every certificate heretofore issued in pursuance thereof is hereby declared void and of no effect, and the Chinese laborer claiming admission by virtue thereof shall not be permitted to enter the United States.

"SEC. 3. That all the duties prescribed, liabilities, penalties, and forfeitures imposed, and the powers conferred by the second, tenth, eleventh and twelfth sections of the act to which this is a supplement, are hereby extended and made applicable to the provisions of this act.

"SEC. 4. That all such part or parts of the act to which this is a supplement as are inconsistent herewith are hereby repealed.

"Approved October 1, 1888."

The validity of this act, as already mentioned, is assailed, as being in effect an expulsion from the country of Chinese

laborers in violation of existing treaties between the United States and the government of China, and of rights vested in them under the laws of Congress. The objection that the act is in conflict with the treaties was earnestly pressed in the court below, and the answer to it constitutes the principal part of its opinion. 36 Fed. Rep. 431. Here the objection made is, that the act of 1888 impairs a right vested under the treaty of 1880, as a law of the United States, and the statutes of 1882 and of 1884 passed in execution of it. It must be conceded that the act of 1888 is in contravention of express stipulations of the treaty of 1868 and of the supplemental treaty of 1880, but it is not on that account invalid or to be restricted in its enforcement. The treaties were of no greater legal obligation than the act of Congress. By the Constitution, laws made in pursuance thereof and treaties made under the authority of the United States are both declared to be the supreme law of the land, and no paramount authority is given to one over the other. A treaty, it is true, is in its nature a contract between nations and is often merely promissory in its character, requiring legislation to carry its stipulations into effect. Such legislation will be open to future repeal or amendment. If the treaty operates by its own force, and relates to a subject within the power of Congress, it can be deemed in that particular only the equivalent of a legislative act, to be repealed or modified at the pleasure of Congress. In either case the last expression of the sovereign will must control.

The effect of legislation upon conflicting treaty stipulations was elaborately considered in *The Head Money Cases*, and it was there adjudged "that so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification, or repeal." 112 U. S. 580, 599. This doctrine was affirmed and followed in *Whitney* v. *Robertson*, 124 U. S. 190, 195. It will not be presumed that the legislative department of the government will lightly pass laws which are in conflict with the treaties of the country; but that circumstances may arise which would not only justify the government in disre-

garding their stipulations, but demand in the interests of the country that it should do so, there can be no question. Unexpected events may call for a change in the policy of the country. Neglect or violation of stipulations on the part of the other contracting party may require corresponding action on our part. When a reciprocal engagement is not carried out by one of the contracting parties, the other may also decline to keep the corresponding engagement. In 1798 the conduct towards this country of the government of France was of such a character that Congress declared that the United States were freed and exonerated from the stipulations of previous treaties with that country. Its act on the subject was as follows:

"*An Act to declare the treaties heretofore concluded with France, no longer obligatory on the United States.*

"Whereas the treaties concluded between the United States and France have been repeatedly violated on the part of the French government; and the just claims of the United States for reparation of the injuries so committed have been refused; and their attempts to negotiate an amicable adjustment of all complaints between the two nations have been repelled with indignity; And whereas, under authority of the French government, there is yet pursued against the United States a system of predatory violence, infracting the said treaties, and hostile to the rights of a free and independent nation:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the United States are of right freed and exonerated from the stipulations of the treaties, and of the consular convention, heretofore concluded between the United States and France; and that the same shall not henceforth be regarded as legally obligatory on the government or citizens of the United States." 1 Stat. 578, c. 67.

This act, as seen, applied in terms only to the future. Of course, whatever of a permanent character had been executed or vested under the treaties was not affected by it. In that respect the abrogation of the obligations of a treaty operates,

like the repeal of a law, only upon the future, leaving transactions executed under it to stand unaffected. The validity of this legislative release from the stipulations of the treaties was of course not a matter for judicial cognizance. The question whether our government is justified in disregarding its engagements with another nation is not one for the determination of the courts. This subject was fully considered by Mr. Justice Curtis, whilst sitting at the circuit, in *Taylor* v. *Morton*, 2 Curtis, 454, 459, and he held that whilst it would always be a matter of the utmost gravity and delicacy to refuse to execute a treaty, the power to do so was prerogative, of which no nation could be deprived without deeply affecting its independence; but whether a treaty with a foreign sovereign had been violated by him, whether the consideration of a particular stipulation of a treaty had been voluntarily withdrawn by one party so as to no longer be obligatory upon the other, and whether the views and acts of a foreign sovereign, manifested through his representative, had given just occasion to the political departments of our government to withhc'd the execution of a promise contained in a treaty or to act in direct contravention of such promise, were not judicial questions; that the power to determine them has not been confided to the judiciary, which has no suitable means to execute it, but to the executive and legislative departments of the government; and that it belongs to diplomacy and legislation, and not to the administration of existing laws. And the learned justice added, as a necessary consequence of these conclusions, that if Congress has this power, it is wholly immaterial to inquire whether it has, by the statute complained of, departed from the treaty or not; or, if it has, whether such departure was accidental or designed; and if. the latter, whether the reasons therefor were good or bad. These views were reasserted and fully adopted by this court in *Whitney* v. *Robertson*, 124 U. S. 190, 195. And we may add to the concluding observation of the learned justice, that if the power mentioned is vested in Congress, any reflection upon its motives, or the motives of any of its members in exercising it, would be entirely uncalled for. This court is not a censor of the morals

of other departments of the government.; it is not invested with any authority to pass judgment upon the motives of their conduct. When once it is established that Congress possesses the power to pass an act, our province ends with its construction, and its application to cases as they are presented for determination. Congress has the power under the Constitution to declare war, and in two instances where the power has been exercised — in the war of 1812 against Great Britain, and in 1846 against Mexico — the propriety and wisdom and justice of its action were vehemently assailed by some of the ablest and best men in the country, but no one doubted the legality of the proceeding, and any imputation by this or any other court of the United States upon the motives of the members of Congress who in either case voted for the declaration, would have been justly the cause of animadversion. We do not mean to intimate that the moral aspects of legislative acts may not be proper subjects of consideration. Undoubtedly they may be, at proper times and places, before the public, in the halls of Congress, and in all the modes by which the public mind can be influenced. Public opinion thus enlightened, brought to bear upon legislation, will do more than all other causes to prevent abuses; but the province of the courts is to pass upon the validity of laws, not to make them, and when their validity is established, to declare their meaning and apply their provisions. All else lies beyond their domain.

There being nothing in the treaties between China and the United States to impair the validity of the act of Congress of October 1, 1888, was it on any other ground beyond the competency of Congress to pass it? If so, it must be because it was not within the power of Congress to prohibit Chinese laborers who had at the time departed from the United States, or should subsequently depart, from returning to the United States. Those laborers are not citizens of the United States; they are aliens. That the government of the United States, through the action of the legislative department, can exclude aliens from its territory is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of its in-

dependence. If it could not exclude aliens it would be to that extent subject to the control of another power. As said by this court in the case of *The Exchange*, 7 Cranch, 116, 136, speaking by Chief Justice Marshall: "The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction. All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source."

While under our Constitution and form of government the great mass of local matters is controlled by local authorities, the United States, in their relation to foreign countries and their subjects or citizens are one nation, invested with powers which belong to independent nations, the exercise of which can be invoked for the maintenance of its absolute independence and security throughout its entire territory. The powers to declare war, make treaties, suppress insurrection, repel invasion, regulate foreign commerce, secure republican governments to the States, and admit subjects of other nations to citizenship, are all sovereign powers, restricted in their exercise only by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations. As said by this court in the case of *Cohens* v. *Virginia*, 6 Wheat. 264, 413, speaking by the same great Chief Justice: "That the United States form, for many, and for most important purposes, a single nation, has not yet been denied. In war, we are one people. In making peace we are one people. In all commercial regulations, we are one and the same people. In many other respects, the American people are one; and the government which is alone capable of controlling and managing their interests in all these respects, is the government of the Union. It is their government, and in that character they have no other. America has chosen to

be in many respects, and to many purposes, a nation; and for all these purposes her government is complete; to all these ob- jects, it is competent. The people have declared, that in the exercise of all powers given for these objects, it is supreme. It can then in affecting these objects legitimately control all indi- viduals or governments within the American territory. The constitution and laws of a State, so far as they are repugnant to the Constitution and laws of the United States, are absolutely void. These States are constituent parts of the United States. They are members of one great empire — for some purposes sovereign, for some purposes subordinate." The same view is expressed in a different form by Mr. Justice Bradley, in *Knox* v. *Lee*, 12 Wall. 457, 555, where he observes that "the United States is not only a government, but it is a national government, and the only government in this country that has the character of nationality. It is invested with power over all the foreign relations of the country, war, peace and negotiations and intercourse with other nations; all which are forbidden to the state governments. It has jurisdiction over all those general subjects of legislation and sovereignty which affect the inter- ests of the whole people equally and alike, and which require uniformity of regulations and laws, such as the coinage, weights and measures, bankruptcies, the postal system, patent and copyright laws, the public lands and interstate commerce, all which subjects are expressly or impliedly prohibited to the state governments. It has power to suppress insurrections, as well as to repel invasions, and to organize, arm, discipline and call into service the militia of the whole country. The Pres- ident is charged with the duty and invested with the power to take care that the laws be faithfully executed. The judiciary has jurisdiction to decide controversies between the States, and between their respective citizens, as well as questions of na- tional concern; and the government is clothed with power to guarantee to every State a republican form of government, and to protect each of them against invasion and domestic violence."

The control of local matters being left to local authorities, and national matters being entrusted to the government of the

Union, the problem of free institutions existing over a widely extended country, having different climates and varied interests, has been happily solved. For local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.

To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated. It matters not in what form such aggression and encroachment come, whether from the foreign nation acting in its national character or from vast hordes of its people crowding in upon us. The government, possessing the powers which are to be exercised for protection and security, is clothed with authority to determine the occasion on which the powers shall be called forth; and its determination, so far as the subjects affected are concerned, are necessarily conclusive upon all its departments and officers. If, therefore, the government of the United States, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, their exclusion is not to be stayed because at the time there are no actual hostilities with the nation of which the foreigners are subjects. The existence of war would render the necessity of the proceeding only more obvious and pressing. The same necessity, in a less pressing degree, may arise when war does not exist, and the same authority which adjudges the necessity in one case must also determine it in the other. In both cases its determination is conclusive upon the judiciary. If the government of the country of which the foreigners excluded are subjects is dissatisfied with this action it can make complaint to the executive head of our government, or resort to any other measure which, in its judgment, its interests or dignity may demand; and there lies its only remedy.

The power of the government to exclude foreigners from the country whenever, in its judgment, the public interests require such exclusion, has been asserted in repeated instances,

and never denied by the executive or legislative departments. In a communication made in December, 1852, to Mr. A. Dudley Mann, at one time a special agent of the Department of State in Europe, Mr. Everett, then Secretary of State under President Fillmore, writes: "This government could never give up the right of excluding foreigners whose presence it might deem a source of danger to the United States." "Nor will this government consider such exclusion of American citizens from Russia necessarily a matter of diplomatic complaint to that country." In a dispatch to Mr. Fay, our minister to Switzerland, in March, 1856, Mr. Marcy, Secretary of State under President Pierce, writes: "Every society possesses the undoubted right to determine who shall compose its members, and it is exercised by all nations, both in peace and war." "It may always be questionable whether a resort to this power is warranted by the circumstances, or what department of the government is empowered to exert it; but there can be no doubt that it is possessed by all nations, and that each may decide for itself when the occasion arises demanding its exercise." In a communication in September, 1869, to Mr. Washburne, our minister to France, Mr. Fish, Secretary of State under President Grant, uses this language: "The control of the people within its limits, and the right to expel from its territory persons who are dangerous to the peace of the State, are too clearly within the essential attributes of sovereignty to be seriously contested. Strangers visiting or sojourning in a foreign country voluntarily submit themselves to its laws and customs, and the municipal laws of France, authorizing the expulsion of strangers, are not of such recent date, nor has the exercise of the power by the government of France been so infrequent, that sojourners within her territory can claim surprise when the power is put in force." In a communication to Mr. Foster, our minister to Mexico, in July, 1879, Mr. Evarts, Secretary of State under President Hayes, referring to the power vested in the constitution of Mexico to expel objectionable foreigners, says: "The admission that, as that constitution now stands and is interpreted, foreigners who render themselves harmful or objectionable to the general govern-

ment must expect to be liable to the exercise of the power adverted to, even in time of peace, remains, and no good reason is seen for departing from that conclusion now. But, while there may be no expedient basis on which to found objection, on principle and in advance of a special case thereunder, to the constitutional right thus asserted by Mexico, yet the manner of carrying out such asserted right may be highly objectionable. You would be fully justified in making earnest remonstrances should a citizen of the United States be expelled from Mexican territory without just steps to assure the grounds of such expulsion, and in bringing the fact to the immediate knowledge of the Department." In a communication to Mr. W. J. Stillman, under date of August 3, 1882, Mr. Frelinghuysen, Secretary of State under President Arthur, writes: "This government cannot contest the right of foreign governments to exclude, on police or other grounds, American citizens from their shores." Wharton's International Law Digest, § 206.

The exclusion of paupers, criminals and persons afflicted with incurable diseases, for which statutes have been passed, is only an application of the same power to particular classes of persons, whose presence is deemed injurious or a source of danger to the country. As applied to them, there has never been any question as to the power to exclude them. The power is constantly exercised; its existence is involved in the right of self-preservation. As to paupers, it makes no difference by whose aid they are brought to the country. As Mr. Fish, when Secretary of State, wrote, in a communication under date of December 26, 1872, to Mr. James Moulding, of Liverpool, the government of the United States "is not willing and will not consent to receive the pauper class of any community who may be sent or may be assisted in their immigration at the expense of government or of municipal authorities." As to criminals, the power of exclusion has always been exercised, even in the absence of any statute on the subject. In a despatch to Mr. Cramer, our minister to Switzerland, in December, 1881, Mr. Blaine, Secretary of State under President Arthur, writes: "While, under the Constitution and

the laws, this country is open to the honest and industrious immigrant, it has no room outside of its prisons or almshouses for depraved and incorrigible criminals or hopelessly dependent paupers who may have become a pest or burden, or both, to their own country." Wharton's Int. Law Dig., *supra*.

The power of exclusion of foreigners being an incident of sovereignty belonging to the government of the United States, as a part of those sovereign powers delegated by the Constitution, the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained on behalf of any one. The powers of government are delegated in trust to the United States, and are incapable of transfer to any other parties. They cannot be abandoned or surrendered. Nor can their exercise be hampered, when needed for the public good, by any considerations of private interest. The exercise of these public trusts is not the subject of barter or contract. Whatever license, therefore, Chinese laborers may have obtained, previous to the act of October 1, 1888, to return to the United States after their departure, is held at the will of the government, revocable at any time, at its pleasure. Whether a proper consideration by our government of its previous laws, or a proper respect for the nation whose subjects are affected by its action, ought to have qualified its inhibition and made it applicable only to persons departing from the country after the passage of the act, are not questions for judicial determination. If there be any just ground of complaint on the part of China, it must be made to the political department of our government, which is alone competent to act upon the subject. The rights and interests created by a treaty, which have become so vested that its expiration or abrogation will not destroy or impair them, are such as are connected with and lie in property, capable of sale and transfer or other disposition, not such as are personal and untransferable in their character. Thus in *The Head Money Cases*, the court speaks of certain rights being in some instances conferred upon the citizens or subjects of one nation residing in the territorial limits of the other, which are "capable of enforcement as

between private parties in the courts of the country." " An illustration of this character," it adds, " is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens." 112 U. S. 580, 598. The passage cited by counsel from the language of Mr. Justice Washington in *Society for the Propagation of the Gospel* v. *New Haven*, 8 Wheat. 464, 493, also illustrates this doctrine. There the learned justice observes that " if real estate be purchased or secured under a treaty, it would be most mischievous to admit that the extinguishment of the treaty extinguished the right to such estate. In truth, it no more affects such rights than the repeal of a municipal law affects rights acquired under it." Of this doctrine there can be no question in this court; but far different is this case, where a continued suspension of the exercise of a governmental power is insisted upon as a right, because, by the favor and consent of the government, it has not heretofore been exerted with respect to the appellant or to the class to which he belongs. Between property rights not affected by the termination or abrogation of a treaty, and expectations of benefits from the continuance of existing legislation, there is as wide a difference as between realization and hopes.

During the argument reference was made by counsel to the alien law of June 25, 1798, and to opinions expressed at the time by men of great ability and learning against its constitutionality. 1 Stat. 570, c. 58. We do not attach importance to those opinions in their bearing upon this case. The act vested in the President power to order all such aliens as he should judge dangerous to the peace and safety of the United States, or should have reasonable grounds to suspect were concerned in any treasonable or secret machination against the government, to depart out of the territory of the United States within such time as should be expressed in his order. There were other provisions also distinguishing it from the act under consideration. The act was passed during a period of great political excitement, and it was attacked and defended with great

zeal and ability. It. is enough, however, to say that it is entirely different from the act before us, and the validity of its provisions was never brought to the test of judicial decision in the courts of the United States.

*Order affirmed.*