**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Guadalupe HERNANDEZ–GUERRERO,
Defendant–Appellant.**

No. 97–50477.

United States Court of Appeals,
Ninth Circuit.

Argued June 1, 1998.

Decided June 25, 1998.

Benjamin L. Coleman, Federal Defenders of San Diego, San Diego, California, for the defendant-appellant.

David P. Curnow, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: O'SCANNLAIN, TROTT, and FERNANDEZ, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether Congress has the power to criminalize reentry into the United States by a previously deported alien.

## I

On January 19, 1997, Border Patrol agents arrested Guadalupe Hernandez–Guerrero near Campo, California, just north of the Mexican border. Hernandez–Guerrero waived his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and advised the arresting officers that he was a Mexican citizen and that he had entered the United States illegally.

In the district court, the government claimed that Hernandez–Guerrero had been deported from the United States seven times, and that he had sustained approximately ten misdemeanor and felony convictions. A grand jury returned a one-count indictment against Hernandez–Guerrero, charging him with being a deported alien-felon found in the United States in violation of 8 U.S.C. § 1326.

Contending that Congress had exceeded its constitutional authority in enacting § 1326, Hernandez–Guerrero moved to dismiss the indictment. The district court denied the motion. *See United States v. Hernandez–Guerrero*, 963 F.Supp. 933 (S.D.Cal. 1997). Hernandez–Guerrero subsequently entered a conditional guilty plea, reserving the right to appeal the district court's dismissal of the indictment. This appeal ensued.

## II

Section 1326(a) of Title 8 of the United States Code provides that, with certain exceptions not relevant here, "any alien who ... has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter ... enters, attempts to enter, or is at any time found in, the United States ... shall be fined ... or imprisoned." 8 U.S.C. § 1326(a). Section 1326(b)(1) prescribes increased penalties for deportees, like Hernandez–Guerrero, whose removal from the Unit-

ed States followed a felony conviction. *See* 8 U.S.C. § 1326(b)(1).

Hernandez–Guerrero insists that Congress was without constitutional authority—under either its inherent immigration power or its enumerated foreign commerce power—to enact § 1326. His argument presents us with an issue of first impression, not only in this court, but, apparently, in any court.

## A

■ Article I of the United States Constitution contains no express reference to immigration among its enumeration of delegated powers; however, for more than a century, it has been universally acknowledged that Congress possesses authority over immigration policy as "an incident of sovereignty." *Chae Chan Ping v. United States*, 130 U.S. 581, 609, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). The Supreme Court has called Congress's inherent immigration power "plenary." *See Kleindienst v. Mandel*, 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). This court has deemed it "sweeping." *See Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir.1998). Whatever the label, all agree that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)).

■ Hernandez–Guerrero acknowledges Congress's broad authority to pass *civil* statutes regulating immigration. He denies, however, that Congress possesses the power to regulate immigration through the *criminal* law. Hernandez–Guerrero presses his civil-criminal distinction on two separate fronts. First, he contends, as a general matter, that Congress may enact criminal laws only "through a two-step constitutional process."

The first step of this process involves tying the criminal law to some power granted to Congress in the Constitution. The second step of the process is a simple recognition that the Necessary and Proper Clause grants Congress the power '[t]o make all

Laws which shall be necessary and proper for carrying into Execution' the powers delegated to it in the Constitution.

The fact that the immigration power is not one of those powers specifically catalogued in Article I, he claims, "is quite important because it prevents Congress from using the two-step process by which it can constitutionally enact criminal laws." In other words, because the immigration power is not explicitly enumerated, the Necessary and Proper Clause—and the "extra" lawmaking authority that it confers—is inapplicable. Unfortunately for Hernandez–Guerrero, however, the Supreme Court. has explicitly eschewed reliance on his two-step inquiry in the arena of foreign affairs: "The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect to our internal affairs." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315–316, 57 S.Ct. 216, 81 L.Ed. 255 (1936). The immigration power, which was born out of a concern for "our relations with foreign nations," *Chae Chan Ping*, 130 U.S. at 606, 9 S.Ct. 623, simply is not an "internal affairs" power; consequently, in exercising its immigration power, Congress is not subject to the rigid constraints that govern its authority in domestic contexts, *see, e.g., United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

■ Citing this court's decisions in *Duldulao v. INS*, 90 F.3d 396 (9th Cir.1996), and *Toquero v. INS*, 956 F.2d 193 (9th Cir.1992), Hernandez–Guerrero next claims that courts have held "without exception, that the immigration power is inherently a civil power, not a criminal one." The cited cases, however, stand for no such proposition. Rather, they stand simply for the proposition that *deportation proceedings* are civil in nature, and are not tantamount to criminal prosecutions. *See Duldulao*, 90 F.3d at 400; *Toquero*, 956 F.2d at 196. Deportation proceedings, of course, do not occupy the entire field of

congressional immigration · authority. And there is not the slightest hint in Ninth Circuit case. law that the whole of the immigration power is exclusively civil, or that Congress is prohibited from employing criminal sanctions to achieve its immigration-regulation objectives. Nor is there any such indication in the tomes of Supreme Court precedent. Quite the contrary, the Supreme Court has explicitly suggested, albeit in dictum, that Congress indeed possesses the constitutional authority to enact criminal immigration statutes such 'as § 1326. In *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), the Court declared, in no uncertain terms, that "it would be plainly competent for congress to declare the act of an alien in remaining unlawfully within the United States to be an offence punishable by fine or imprisonment, if such offence were to be established by a judicial trial." *Id.* at 235, 16 S.Ct. 977. Hernandez–Guerrero complains that *Wong Wing* is "outdated" and, by implication, unworthy of our respect.[1] We are not, however, a court of last resort; we do not have the luxury of simply disregarding Supreme Court precedent of which we have grown either tired or suspicious. Moreover, at no time during the last century has any court questioned or contradicted *Wong Wing*'s ·endorsement of Congress's prerogative to enact criminal immigration laws.

Even aside from *Wong Wing*, we would find it difficult to deny Congress's authority to enact § 1326 pursuant to its immigration power. Although Congress's authority over immigration policy has enjoyed various formulations, it has always been cast in comprehensive terms. It has, for instance, been described as the authority to "control" immigration, *see Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), and the power to "prohibit or regulate" the influx of aliens, *Pena–Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir.1968). In fact, the Supreme Court once defined Congress's immigration power as including "*any* policy toward aliens." *Hari-*

---

1. No more "outdated," we think, than *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), without the benefit of which Hernandez– Guerrero could not be before us arguing the unconstitutionality of a federal statute. The irony is unmistakable.

*siades v. Shaughnessy,* 342 U.S. 580, 588, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (emphasis added). Regardless of its precise characterization—be it "controlling" or "regulating" or something else—congressional immigration authority is, we conclude, sufficiently capacious to sustain § 1326.

The text of § 1326 plainly reveals its immigration-regulation purpose. By threatening with criminal prosecution any alien found in the United States who has previously been "excluded, deported, or removed," Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders. Indeed, this court has specifically recognized that "8 U.S.C. § 1326 is designed to effectively enforce the immigration laws." *United States v. Barron-Rivera,* 922 F.2d 549, 555 (9th Cir.1991). It "is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." *Pena-Cabanillas,* 394 F.2d at 788; *see also United States v. Cupa-Guillen,* 34 F.3d 860, 863 (9th Cir.1994) ("[T]here is a strong societal interest in controlling immigration and in effectively policing our borders. This interest is furthered by enhancing punishment against persons who illegally enter the country after having previously committed aggravated felonies." (citation omitted)). In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite.[2] Because its "clear purpose ... is to deter aliens who have been forced to leave the United States from reentering the United States," *United States v. Cooke,* 850 F.Supp. 302, 306 (E.D.Pa.1994), § 1326 is well within the ambit of Congress's sweeping power over immigration matters.

The district court was correct to reject Hernandez–Guerrero's immigration-power challenge.

**2.** Asked at oral argument what the federal government should do if deported aliens continue to return to American soil, Hernandez-Guerrero's counsel suggested that the United States might wish to follow the Chinese example and "build a

### B

Because we hold that Congress possessed ample authority to enact § 1326 pursuant to its inherent immigration power, we need not address Hernandez–Guerrero's contention that, in passing § 1326, Congress exceeded its constitutional power under the Foreign Commerce Clause, *see* U.S. Const. art. I, § 8, cl. 3. ("Congress shall have Power ... To regulate Commerce with foreign Nations.").

### III

In the final analysis, despite some overblown rhetoric, the constitutional calculus is straightforward. Does Congress have the authority to regulate immigration? Of course. May Congress, pursuant to that authority, enact criminal laws aimed at enforcing its immigration policies? Yes. Is § 1326 such a law? We hold today that it is.

**AFFIRMED.**

wall." Even were we to assume that counsel was being serious (which we trust he was not), we do not believe that the immigration power is so limited in scope.