## UNITED STATES v. CHU CHEE et al.

(Circuit Court of Appeals, Ninth Circuit. March 6, 1899.)

### No. 455.

1. CHINESE EXCLUSION ACT — PROCEEDINGS FOR DEPORTATION — EVIDENCE OF RIGHT TO REMAIN IN UNITED STATES.

A Chinese person, who obtains entry into the United States without the certificate from the Chinese government showing him to be a member of the class privileged to enter, which is required by the acts of congress, cannot establish his right to remain, when arrested under the act of May 5, 1892, as a Chinese laborer within the United States without the certifi-

cate of residence required by law, by proof that since his entry he has not been a laborer, but has followed the occupation of a member of the privileged class.

**2. SAME—EVIDENCE OF RIGHT TO ENTER.**

A certificate of a consul of the United States in China, not indorsed on one from the Chinese government, is not evidence tending to establish the right of a Chinese person to entry into the United States.

**3. SAME—CHINESE LABORERS AS A CLASS—STATUS OF MINOR CHILDREN.**

The purpose of the Chinese exclusion acts is to prohibit the entry into the United States of Chinese laborers as a class, and the status of minor children of a laborer is that of their father.

In Error to the District Court of the United States for the District of Oregon.

This was a proceeding for the deportation of the defendants, two Chinese boys, aged, respectively, 13 and 15 years, born in the empire of China, and brought to this country in May, 1896, landing at Port Townsend, in the district of Washington, as students, upon the presentation of the following certificates:

"Consulate of the United States, Hong Kong, April 9, 1896.

"I, Wm. E. Hunt, consul of the United States of America for the colony of Hong Kong and its dependencies, hereby certify that two Chinese youths, namely, Chu How and Chu Chee, appeared before me this day, and presented a letter, addressed to me by Messrs. Kinsey and Markley, hereto appended, and requested for a certificate of identity, as they are going to the United States, in response to a call, as alleged, of their father, a resident of Eugene, Oregon, for the purpose of acquiring an English education.

"And for the better identification of these boys, their photographic likenesses are hereto appended, and their descriptions are as the following:

| | | |
|---|---|---|
| Chu How, arrived May 11, 1896, on board Br. Str. Tacoma, from Hong Kong, China.<br>WALTER BOWEN, Special Agent. | Name: Chu How. Height: 4 feet 5¼ inches. Age: 11 years. Physical peculiarities: A scar on forehead; a mole front of right ear. Native of Sun Hui, Kwongtung. | (Photograph.)<br>U. S. Consulate,<br>Hong Kong,<br>China.<br>Chu How. |
| Chu Chee, arrived May 11, 1896, on board Br. Str. Tacoma, from Hong Kong, China.<br>WALTER BOWEN, Special Agent. | Name: Chu Chee. Height: 4 feet, 7⅛ inches. Age: 13 years. Physical peculiarities: A mole on inner end of l. eyebrow; a scar on outer end of r. eyebrow. | (Photograph.)<br>U. S. Consulate,<br>Hong Kong,<br>China.<br>Chu Chee. |

"Given under my hand and seal of office, at Hong Kong, the day and year aforesaid.                                        W. E. Hunt, U. S. Consul."

"Eugene, Oregon, December 23, 189—.

"United States Consul, Hong Kong, China—Dear Sir: There are two boys coming from the country into Hong Kong to take the steamer to Portland, Oregon, U. S. A. The father of these boys is living at Eugene, Oregon, and has been living there for three years last past. The object of the father of these boys, in bringing them to the U. S., is for the purpose of educating them in the schools of this state. The younger one is named Chu How, and is eleven years of age. The other, Chu Chee; age, thirteen. We inclose with photographs of the two boys.

"Yours, respectfully,                                        Kinsey and Markley."

The defendants did not present, or appear to possess, any other certificates entitling them to land. On April 20, 1898, nearly two years after the defendants were permitted to land, the United States attorney for the district of Oregon filed an information against them, charging that they were Chinese laborers, without the certificate of residence required by law, and therefore unlawfully within the United States. It was shown upon the trial of the case that the defendants were then, and had been since their arrival in this country, students in the English schools of Eugene City, Or., having no other vo-

cation; that the father of the defendants came to this country a number of years before the arrival of the boys, and had been engaged in the labor of a laundryman in said city. The court held that the occupation of the father could not be imputed to the children against the status of students which they had acquired in this country. The application to remand was accordingly denied, and the defendants ordered discharged. From this judgment the United States appeals.

John H. Hall, U. S. Dist. Atty.

A. L. Worley, W. W. Thayer, and Henry St. Rayner, for defendants in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The defendants were arrested under the provisions of the act of congress entitled "An act to prohibit the coming of Chinese persons into the United States," approved May 5, 1892 (27 Stat. 25, c. 60), as amended by the act of November 3, 1893 (28 Stat. 7, c. 14). Section 1 of the first-named act provides:

"That all laws now in force prohibiting and regulating the coming into this country of Chinese persons and persons of Chinese descent are hereby continued in force for a period of ten years from the passage of this act."

Section 3 provides:

"That any Chinese person or person of Chinese descent arrested under the provisions of this act or the acts hereby extended shall be adjudged to be unlawfully within the United States unless such person shall establish, by affirmative proof, to the satisfaction of such justice, judge, or commissioner, his lawful right to remain in the United States."

The laws in force on the 5th day of May, 1892, upon the subject of Chinese exclusion, had their origin in the treaty between the United States and the empire of China, dated November 17, 1880. Articles 1 and 2 of this treaty provide as follows:

"Article 1. Whenever in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a character only as necessary to enforce the regulation, limitation, or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse.

"Art. 2. Chinese subjects, whether proceeding to the United States as teachers, students, merchants or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation."

Pursuant to this treaty congress passed the act entitled "An act to execute certain treaty stipulations relating to Chinese," approved May 6, 1882 (22 Stat. 58, c. 126). This was the first of the exclusion acts passed by congress. It provides, in section 1, that from and

after the expiration of 90 days after the passage of the act, and until the expiration of 10 years next succeeding its passage, the coming of Chinese laborers to the United States should be suspended, and during such suspension it should not be lawful for any Chinese laborer to come, or, having so come, after the expiration of said 90 days to remain within the United States. The fourth section declares that, for the purpose of identifying the Chinese laborers who were here on the 17th day of November, 1880, or who should come within the 90 days mentioned, and to furnish them with the proper evidence of their right to go and come to the United States, the—

"Collector of customs of the district from which any such Chinese laborer shall depart from the United States, shall in person or by deputy, go on board each vessel having on board any such Chinese laborer, and cleared or about to sail from his district for a foreign port, and on such vessel make a list of all such Chinese laborers, which shall be entered in registry books to be kept for that purpose, in which shall be stated the name, age, occupation, last place of residence, physical marks or peculiarities, and all facts necessary for the identification of each of such Chinese laborers, which books shall be safely kept in the custom house."

And each Chinese laborer thus departing was entitled to receive from the collector or his deputy a certificate containing such particulars, corresponding with the registry, as would identify him. This certificate of identification entitled the Chinese laborer to whom it was issued to return and re-enter the United States upon producing and delivering the same to the collector of customs of the district at which such Chinese laborer should seek to re-enter. The sixth section of the act provides that, for the faithful execution of the treaty of November 17, 1880, every Chinese person, other than a laborer, who may be entitled by the treaty and by the act to come within the United States, and who is about to come,

"Shall be identified as so entitled by the Chinese government in each case, such identity to be evidenced by certificate issued under the authority of said government, which certificate shall be in the English language or (if not in the English language) accompanied by a translation into English, stating such right to come, and which certificate shall state the name, title, or official rank, if any, the age, height, and all physical peculiarities, former and present occupation or profession, and place of residence in China of the person to whom the certificate is issued, and that such person is entitled conformably to the treaty in this act mentioned to come within the United States. Such certificate shall be prima facie evidence of the facts set forth therein, and shall be produced to the collector of customs, or his deputy, of the port in the district in the United States at which the person named therein shall arrive."

From this provision diplomatic and other officers of the Chinese government, traveling upon the business of that government, are exempted; their credentials being taken as equivalent to the certificate.

It is a matter of history that this act proved ineffective to prevent the coming of Chinese laborers into the United States. The immigration of Chinese persons claiming to belong to the privileged classes increased rapidly, and, among others, Chinese laborers who had no return certificates, but who claimed the right to return on the ground that they were in the country at the date of the treaty, and had departed before the passage of the act of congress providing for return certificates. The subject being brought to the attention of congress,

the act of 1882 was amended for the purpose of prohibiting the landing of any Chinese laborers in the United States who could not produce return certificates. The amendatory act is the act of July 5, 1884 (23 Stat. 115, c. 220). Among other amendments, section 4 of the act of 1882 was amended by adding to the provision relating to the return certificate:

"And said certificate shall be the only evidence permissible to establish his right of re-entry."

And section 6 was amended, with respect to the certificate to be produced by Chinese persons other than laborers, so that the section should read as follows:

"Every Chinese person, other than a laborer, who may be entitled by said treaty or this act to come within the United States, and who shall be about to come to the United States, shall obtain the permission of and be identified as so entitled by the Chinese government, or of such other foreign government of which at the time such Chinese person shall be a subject, in each case to be evidenced by certificate issued by such government, which certificate shall * * * before such person goes on board any vessel to proceed to the United States, be viséd by the indorsement of the diplomatic representatives of the United States in the foreign country from which said certificate issues, or of the consular representative of the United States, * * * and it shall be his duty, before indorsing such certificate as aforesaid, to examine into the truth of the statements set forth in said certificate, and if he shall find upon examination that said or any of the statements therein contained are untrue, it shall be his duty to refuse to indorse the same. Such certificate viséd as aforesaid shall be prima facie evidence of the facts set forth therein, and shall be produced to the collector of customs of the port in the district in the United States at which the person named therein shall arrive, and afterward produced to the proper authorities of the United States whenever lawfully demanded, and shall be the sole evidence permissible on the part of the person so producing the same to establish a right of entry into the United States; but said certificate may be controverted and the facts therein stated disproved by the United States authorities."

The purpose of congress in these amendments was to provide that no Chinese laborer, or Chinese person other than a laborer (except diplomatic and other officers of the Chinese government, traveling upon the business of the government), should be permitted to land or come into the United States, unless he could produce the appropriate certificate as required by the act of 1882; but the amendments failed of their purpose, particularly the one relating to the certificate for returning Chinese laborers,—the supreme court holding, in the case of Chew Heong v. U. S., 112 U. S. 536, 5 Sup. Ct. 255, that the fourth section of the act of 1882, as amended by the act of 1884, prescribing the certificate which should be produced by a Chinese laborer as the only evidence permissible to establish his right of re-entry into the United States, was not applicable to Chinese laborers who, residing in this country at the date of the treaty of November 17, 1880, departed by sea before May 6, 1882, and remained out of the United States until after July 5, 1884. The effect of this decision was that the return certificate for Chinese laborers was the only evidence permissible on the part of the person producing it, but for those who could not produce such evidence, by reason of departure from the country before the act of 1882 went into effect, other competent testimony was admissible. The court says, among other things:

93 F.—51

"What injustice could be more marked than, by legislative enactment to recognize the existence of a right by treaty to come within the limits of the United States, and at the same time to prescribe, as the only evidence permissible to establish it, the possession of a collector's certificate that could not possibly have been obtained by the person to whom the right belongs? Or to prevent the re-entry of a person into the United States upon the ground that he did not, upon his arrival from a foreign port, produce a certain certificate, under the hand and seal of a collector, and upon forms prescribed by the secretary of the treasury, which neither that nor any other officer was authorized or permitted to give prior to the departure of such person from this country? Or what incongruity is more evident than to impose upon a collector the duty of going on board of a vessel about to sail from his district for a foreign port, and making and recording a list of its passengers of a particular race, showing their individual, family, and tribal names in full, their age, occupation, last place of residence, and physical marks and peculiarities, when such vessel had sailed long before the law passed which imposed that duty on the collector? These questions suggest the consequences that must result if it is held that congress intended to abrogate the treaty with China by imposing conditions upon the enjoyment of rights secured by it which are impossible of performance."

The failure of the act of 1884 to cure the defects in the act of 1882 resulted in both the legislative and executive departments of the government taking up the subject, with the view of providing an effective measure of exclusion against the continual influx of Chinese immigrants. A new treaty was negotiated by the state department, and congress immediately passed the act of September 13, 1888 (25 Stat. 476), to carry the treaty into effect. The treaty was, however, finally rejected by the Chinese government, and as a consequence that portion of the act dependent upon the ratification of the treaty failed to become a law. Thereupon congress very promptly passed an act to supplement the act of 1882. It was approved October 1, 1888 (25 Stat. 504, c. 1064), and provided that it should be unlawful for any Chinese laborer who had at any time before been, or who was then or might thereafter be, a resident of the United States, and who had departed or should thereafter depart therefrom, and had not returned before the passage of the act, to return to or remain in the United States, and that no certificate of identity provided for in the fourth and fifth sections of the act of 1882 should thereafter be issued, and every certificate theretofore issued in pursuance of said section was declared void and of no effect, and the Chinese laborer claiming admission by virtue thereof should not be permitted to enter the United States. This act closed the door effectually against Chinese laborers coming into the United States upon any claim of prior residence, whether supported by return certificates or proof of residence in the United States between November 17, 1880, and August 5, 1882.

In the case of Chae Chan Ping v. U. S., 130 U. S. 581, 9 Sup. Ct. 623, the validity of this act was assailed as being in effect an expulsion from the country of Chinese laborers in violation of existing treaties between the United States and the government of China, and of rights vested in them under the laws of congress. Judge Field, speaking for the supreme court, reviews the history of Chinese immigration into the United States, and the treaties and legislation upon the subject, and holds that the act of October 1, 1888, revoking all return certificates, and excluding Chinese laborers from the United States, was a constitutional exercise of legislative power,

and, so far as it conflicted with existing treaties between the United States and China, it operated to that extent to abrogate them as part of the municipal law of the United States.

In the case of Wan Shing v. U. S., 140 U. S. 424, 11 Sup. Ct. 729, the petitioner, in an application for a writ of habeas corpus, alleged that he was restrained of his liberty on board the steamship Arabic in the port of San Francisco; the master of the vessel claiming that the petitioner was not entitled to land under the provisions of the act of congress of May 6, 1882, and the act amendatory thereof. The petitioner alleged that he was a resident of the United States on the 17th of November, 1880, and departed therefrom prior to the 6th day of June, 1882, and that at all the times mentioned he was a merchant doing business in San Francisco, having only temporarily left the United States on April 19, 1882. His claim was that he belonged to the privileged class. The supreme court affirmed a judgment of the circuit court remanding the petitioner, holding that his right to land rested upon his establishing the fact that he was not a laborer within the provisions of the act of October 1, 1888, and that could only have been shown by a certificate of identity issued under the authority of the Chinese government. The court upon this point said:

"The result of the legislation respecting the Chinese would seem to be this: that no laborers of that race shall hereafter be permitted to enter the United States, or even to return after having departed from the country, though they may have previously resided therein, and have left with a view of returning; and that all other persons of that race, except those connected with the diplomatic service, must produce a certificate from the authorities of the Chinese government, or of such other foreign government as they may at the time be subjects of, showing that they are not laborers, and have the permission of that government to enter the United States, which certificate is to be viséd by a representative of the government of the United States."

The effect of these decisions was to determine that the privilege of Chinese laborers to come to or remain in the United States was a subject within legislative control, to be regulated, suspended, or entirely abrogated, as congress should declare, and that the law of the Chew Heong Case, supra, was no longer authority in construing the exclusion acts.

We come, now, to the consideration of the statute under which the defendants were arrested as being unlawfully in the United States. The title and terms of exclusion of the act approved May 5, 1892, indicate that the scope and purpose of the act are to permit only such persons to enter or remain in the United States who are expressly designated as being entitled to the privilege. The title of the act is, "An act to prohibit the coming of Chinese persons into the United States." The first section, in extending the laws then in force for a period of 10 years, prohibits and regulates the coming into this country of "Chinese persons and persons of Chinese descent"; and the third section provides that any "Chinese person or person of Chinese descent" arrested under the provisions of the act shall be adjudged to be unlawfully within the United States, unless such person shall establish, by affirmative proof, to the satisfaction of the parties, judge, or commissioner, his lawful right to remain in

the United States. Section 6 provides that it shall be the duty of all Chinese laborers within the limits of the United States at the time of the passage of the act, and who were entitled to remain in the United States, to apply to the collectors of internal revenue of the respective districts for a certificate of residence. The charge in the information of the United States attorney upon which the defendants were arrested is that they are Chinese laborers found within the United States without a certificate of residence, as provided by the act of congress to which reference has just been made.

The right of the defendants to enter the United States appears to have been determined by the collector of customs at Port Townsend upon a certificate issued by the United States consul at Hong Kong as to their identity, and upon the statement contained in the certificate that:

"They are going to the United States in response to a call, as alleged, of their father, a resident of Eugene, Oregon, for the purpose of acquiring an English education."

The right of the defendants to remain in the United States is based upon oral testimony that:

"Immediately upon being landed said defendants proceeded at once to the city of Eugene, the home of their father, and that ever since said time they have been attending public and private schools in that city, and have acquired the English language, and made rapid progress in their studies."

The purpose of the consular certificate, as evidence before the court in this case, was apparently as tending to establish the fact that defendants were students, and belonged to the privileged class, and were entitled to come into the United States by the act of May 6, 1882, as amended by the act of July 5, 1884; but it is clear that the certificate is not in conformity with that section, and does not tend to establish the fact in question. It does not contain the permission of the Chinese government, nor are the defendants identified by that government as being entitled to come to the United States. It is wholly a document issued by the United States consul at Hong Kong, without authority of law, and without any value as evidence of the right of the defendants to come into or remain within the United States; and, being landed upon such insufficient evidence, they were unlawfully within the United States. U. S. v. Moc Chew, 7 U. S. App. 534, 4 C. C. A. 482, and 54 Fed. 490; Wan Shing v. U. S., 140 U. S. 424, 11 Sup. Ct. 729.

But it is contended on the part of the defendants that the status of Chinese aliens domiciled in the United States must be determined according to their status at the time of arrest, and not at the time of entry, and that, upon being arrested, it was competent for them to show by affirmative proof that they were students engaged in acquiring an education in our schools, and, being so engaged, they were not members of the prohibited class, and not subject to deportation. When, however, that domicile has been acquired contrary to and in violation of the laws of the United States, and when, as here, it is only through an unlawful entry into the United States that the Chinese persons secure a residence in this country, they cannot purge themselves of their offense by assuming the occupation of

members of the privileged class, and establish their right to remain by proof of that character. The right of the defendants to land in this country on the claim of being students was dependent upon their producing to the collector of customs, at the port of their arrival, the certificate required by section 6 of the act of 1882, as amended; and to entitle them to remain here they must thereafter produce the same to the proper authorities whenever lawfully demanded.

But not only do the defendants fail to show that their entry into and residence in the United States was lawful, and under a certificate showing that they belonged to a privileged class, but it appears affirmatively that they were at that time the minor children of a Chinese laborer, and that they are still minors. The status of the defendants, under the laws, was that of the father. The policy of the exclusion acts is to prohibit the entry into the United States of the entire class of Chinese laborers as a class. In re Ah Quan, 10 Sawy. 222, 21 Fed. 182; In re Ah Moy, 10 Sawy. 345, 21 Fed. 785; In re Li Foon, 80 Fed. 881. The defendants belonged to that class upon their arrival in this country, and they so continued up to the time of their arrest; and, not having the certificate as required by section 6 of the act of May 5, 1892, as amended by the act of November 3, 1893, they were not entitled to remain in the United States, and should have been deported. Judgment reversed.