WYNN, Circuit Judge,
concurring:
Invidious discrimination that is shrouded in layers of legality is no less an insult to our Constitution than naked invidious discrimination. We have matured from the lessons learned by past experiences documented, for example, in Dred Scott and Korematsu. But we again encounter the affront of invidious discrimination—this time layered under the guise of a President’s claim of unfettered congressionally delegated authority to control immigration and his proclamation that national security requires his exercise of that authority to deny entry to a class of aliens defined solely by their nation of origin. Laid bare, this Executive Order is no more than what the President promised before and after his election: naked invidious discrimination against Muslims. Such discrimination contravenes the authority Congress delegated to the President in the Immigration and Nationality Act (the “Immigration Act”), 8 U.S.C. § 1101 et seq., and it is unconstitutional under the Establishment Clause.
To that end, I concur fully in the majority opinion, including its analysis and conclusion that Section 2(c) of the Executive Order, which suspends entry of nationals from six predominantly Muslim countries, likely violates the Establishment Clause. In particular, I agree that even when the President invokes national security as a justification for a policy that encroaches on fundamental rights, our courts must not turn a blind eye to statements by the President and his advisors bearing on the policy’s purpose and constitutionality. Those statements characterized Section 2(c) as the realization of the President’s repeated promise, made before and after he took office, to ban Muslims.[1] And I *613 agree that “the Government’s asserted national security interest in enforcing Section 2(c) appears to be a post hoc, secondary justification for an executive action rooted in religious animus and intended to bar Muslims from this country.”[2] Ante at 603.
I -write separately because I believe Plaintiffs’ claim that Section 2(c)-exceeds the President’s authority under the Immigration Act also is likely to succeed on the merits. That statute authorizes the President to suspend the “entry of any aliens or of any class of aliens” that he finds “would be detrimental to the interests of the United States.” 8 U.S.C. § 1182(f). Because the Executive Order here relies on national origin as a proxy for discrimination based on religious animus, the Government’s argument that Section 2(c)’s suspension on entry “falls squarely within the President’s broad authority” under Section 1182(f) essentially contends that Congress delegated to the President virtually unfettered discretion to deny entry to any class of aliens, including to deny entry solely on the basis of nationality and religion. Appellants’ Br. at 28. Not so.
To the contrary, the Immigration Act provides no indication that Congress intended the “broad generalized” delegation of authority in Section 1182(f) to allow the President “to trench ... heavily on [fundamental] rights.”[3] And even if the plain language of Section 1182(f) suggested Congress had given the President such unfettered discretion to invidiously discriminate based on nationality and religion—-which it does not—a statute delegating to the President the authority to engage in such invidious discrimination would raise grave constitutional concerns. Indeed, imposing burdens on individuals solely on the basis of their race, national origin, or religion— “a classification of persons undertaken for its own sake ... inexplicable by anything but animus towards the class it affects”[4]— is “odious to a free people whose institutions are founded upon the doctrine of equality.”[5] That is why—even when faced with a congressional delegation of seemingly unbridled power to the President or his appointees—the Supreme Court repeatedly “ha[s] read significant limitations into ... immigration statutes in order to avoid their constitutional invalidation” when the delegation provides no explicit statement that Congress intended for the executive to use the delegated authority in *614 a manner in conflict with constitutional protections.[6]
Accordingly, I conclude that Section 2(c)’s suspension on entry likely exceeds the President’s authority under the Immigration Act to deny entry to classes of aliens.
I.
The majority opinion does not reach the merits of Plaintiffs’ claim that Section 2(e)’s suspension on entry violates the Immigration Act, and Section 1182(f), in particular. Ante at 579-81. The district court, however, concluded that the Executive Order likely violates the Immigration Act insofar as Section 2(c) effectively prohibits the issuance of immigrant visas to aliens from the six countries based on their nationalities. Int’l Refugee Assistance Project v. Trump, — F. Supp. 3d —, —, 2017 WL 1018235, at *10 (D. Md. Mar. 16, 2017). And the Government has argued, both on appeal and before the district court, that the suspension on entry falls within the President’s delegated power under Section 1182(f). Appellants’ Br. at 28-30. Accordingly, the question of whether Section 2(c) complies with Section 1182(f) is squarely before this Court.[7]
Section 1182(f) provides, in relevant part, that “[wjhenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, .he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.” 8 U.S.C. § 1182(f). Like the district court, the majority opinion finds, and I agree, that Plaintiffs are likely to establish— based on statements by the President and his advisors—that in promulgating Section 2(c), the President relied on one suspect classification (national origin) as a proxy to purposely discriminate against members of another suspect class (adherents to a particular religion) solely on the basis of their membership in that class. Ante at 594-95. Thus, in considering Plaintiffs’ statutory claim, we confront the following question: Did Congress, in enacting Section 1182(f), authorize the President to deny entry to a class of aliens on the basis of invidious discrimination?
*615 A.
Two related canons of statutory construction bear directly on this question. First, under the “constitutional avoidance canon,” “when an Act of Congress raises ‘a serious doubt’ as to its constitutionality, ‘[courts must] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.’ ” Zadvydas v. Davis, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)). “[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is ‘fairly possible’ [courts] are obligated to construe the statute to avoid such problems.” I.N.S. v. St. Cyr, 533 U.S. 289, 299-300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citation omitted) (quoting Crowell, 285 U.S. at 62, 52 S.Ct. 285). This canon “rest[s] on the reasonable presumption that Congress did not intend [an interpretation] which raises serious constitutional doubts.” Clark v. Martinez, 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). Put differently, “[t]he courts will ... not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.” Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).
The Supreme Court has applied the constitutional avoidance canon on several occasions to narrow facially broad statutes relating to immigration and national security. For example, in Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court assessed whether Section 1231(a)(6) of the Immigration Act—which provides that certain categories of aliens who have been ordered removed “may be detained beyond the removal period”—authorized the detention of such categories of aliens indefinitely. 533 U.S. at 689, 121 S.Ct. 2491. Notwithstanding that Section 1231(a)(6) placed no express limitation on the duration of such detentions, the Supreme Court “read an implicit limitation into the statute ... limiting] an alien’s post-removal-period detention to a period reasonably necessary to bring about that alien’s removal from the United States.” Id. Explaining that “permitting indefinite detention of an alien would raise a serious constitutional problem” and noting the absence of “any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed,” the Supreme Court concluded that the constitutional avoidance canon required adoption of the “implicit limitation.” Id. at 690, 697, 121 S.Ct. 2491.
The Supreme Court also relied on the constitutional avoidance canon in I.N.S. v. St. Cyr, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In that case, the Supreme Court rejected the Government’s arguments that two statutes amending the Immigration Act (1) deprived the judiciary of jurisdiction to review habeas petitions filed by certain aliens subject to removal orders and (2) retroactively deprived certain aliens who had pled guilty to criminal offenses—which convictions rendered such aliens removable—the opportunity to pursue a discretionary waiver of removal, notwithstanding that such aliens had been entitled to pursue such a waiver at the time of their plea. Id. at 292-93, 297, 121 S.Ct. 2271. In reaching these conclusions, the Supreme Court acknowledged that Congress, at least in certain circumstances, has the constitutional authority to repeal habeas jurisdiction and to make legislation retroactive. Id. at 298-99, 315-16, 121 S.Ct. 2271. Nonetheless, because (1) the Government’s proposed constructions would require the Supreme Court to hold *616 that Congress intended to exercise “the outer limits of [its] power” under the Constitution and (2) the legislation included no “clear, unambiguous, and express statement of congressional intent” indicating that Congress intended to exercise the “outer limits” of its power, the Supreme Court rejected the Government’s positions. Id. at 299, 313-26, 121 S.Ct. 2271.
The second applicable canon of construction—which is a corollary to the constitutional avoidance canon—requires an even clearer indication of congressional intent regarding the infringement on constitutional rights due to the absence of direct action by Congress. That canon forbids courts from construing a “broad generalized” delegation of authority by Congress to the executive as allowing the executive to exercise that delegated authority in a matter that “trench[es]” upon fundamental rights, Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), absent an “explicit” statutory statement providing the executive with such authority, Greene v. McElroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Under this canon, which I will refer to as the “delegation of authority canon,” courts must “construe narrowly all delegated powers that curtail or dilute” fundamental rights. Kent, 357 U.S. at 129, 78 S.Ct. 1113; see also United States v. Robel, 389 U.S. 258, 275, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring) (“The area of permissible indefiniteness [in a delegation] narrows, however, when the regulation ... potentially affects fundamental rights.... This is because the numerous deficiencies connected with vague legislative directives ... are far more serious when liberty and the exercise of fundamental rights are at stake.”). The Supreme Court requires that delegations that potentially authorize the executive to encroach on fundamental rights “be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws.” Greene, 360 U.S. at 507, 79 S.Ct. 1400 (emphasis added) (citation omitted).
As with the constitutional avoidance canon, the Supreme Court has applied the delegation of authority canon to statutes involving immigration and national security. For example, in United States v. Witkovich, 353 U.S. 194, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957), the Supreme Court interpreted Section 242(d)(3) of the Immigration and Nationality Act of 1952, which provided that the Attorney General could require any alien subject to a final order of deportation that had been outstanding for more than six months “to give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper.” 353 U.S. at 195, 77 S.Ct. 779 (quoting 8 U.S.C. § 1252(d)(3) (1952)). The Government asserted that the plain language of the provision afforded the Attorney General near unfettered discretion to demand information from such aliens. Id. at 198, 77 S.Ct. 779. Although the Supreme Court acknowledged that “[t]he language of [Section] 242(d)(3), if read in isolation and literally, appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of [such] aliens,” the Supreme Court limited the Attorney General’s authority under Section 242(d)(3) to “questions reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue.” Id. at 199, 202, 77 S.Ct. 779. In rendering this narrowing construe *617 tion, the Supreme Court emphasized, first, that the broad reading proposed by the Government would call into question the statute’s constitutional validity and, second, that the context and legislative history did not provide unambiguous evidence that Congress intended to give the Attorney General the unbridled authority the Government claimed. Id. at 199-200, 77 S.Ct. 779.
The Supreme Court also applied the delegation of authority canon in Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). There, the Supreme Court was asked to construe a statute providing that “[t]he Secretary of State may grant and issue passports ... under such rules as the President shall designate and prescribe for and on behalf of the United States.” 357 U.S. at 123, 78 S.Ct. 1113 (internal quotation marks omitted) (quoting 22 U.S.C. § 211a (1952)). Pursuant to that authority, the executive branch promulgated a regulation authorizing the Secretary of State to demand an affidavit from any passport applicant averring whether the applicant had ever been a Communist and barring issuance of passports to Communists. Id. at 118 & n.2, 78 S.Ct. 1113. Under that regulation, the Department of State denied a passport to an applicant on grounds he refused to submit such an affidavit. Id. at 118-19, 78 S.Ct. 1113. Thereafter, the applicant sought a declaratory judgment that the regulation was unconstitutional. Id. at 119, 78 S.Ct. 1113. Despite the breadth of the plain language of the delegating statute, the Supreme Court “hesitate[d] to impute to Congress ... a purpose to give [the Secretary of State] unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose.” Id. at 128, 78 S.Ct. 1113. Emphasizing (1) that the authority to deny a passport necessarily involved the power to infringe on the fundamental right to travel and (2) that the statutory delegation provision’s “broad generalized” terms were devoid of any “explicit” indication Congress had intended to “give[ ] the Secretary authority to withhold passports to citizens because of their beliefs or associations,” the Supreme Court refused “to find in this broad generalized power an authority to trench so heavily on the rights of the citizen.” Id. at 129-30, 78 S.Ct. 1113.
Taken together, the two canons reflect the basic principle that “when a particular interpretation of a statute invokes the outer limits of Congress’ power, we expect a clear indication that Congress intended that result.” St. Cyr, 533 U.S. at 299, 121 S.Ct. 2271; see also United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 548, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (Frankfurter, J., dissenting) (explaining that legislation potentially encroaching on fundamental rights “should not be read in such a decimating spirit unless the letter of Congress is inexorable”). Although closely related, the two canons are analytically distinct. In particular, the constitutional avoidance canon involves direct actions by Congress that potentially encroach upon fundamental rights. By contrast, the delegation of authority canon governs delegations by Congress that potentially allow a delegatee to exercise congressional power to encroach on fundamental rights. Because Congress does not itself decide when or how its delegated authority will be exercised, any encroachment on individual rights by Congress’s delegatee must be supported by an “explicit” statement that Congress intended to permit such encroachment, Greene, 360 U.S. at 507, 79 S.Ct. 1400—a more stringent requirement than the “clear indication” necessary when Congress acts directly, Zadvydas, 533 U.S. at 696-97, 121 S.Ct. 2491.
B.
The constitutional avoidance canon and the delegation of authority canon bear di *618 rectly on the scope of authority conferred on the President by Congress under Section 1182(f) because, if construed broadly, Section 1182(f) could authorize the President to infringe on fundamental constitutional rights. In particular, the Supreme Court has “consistently repudiated ‘(distinctions between citizens solely because of their ancestry’ [or race] as being ‘odious to a free people whose institutions are founded upon the doctrine of equality.’ ” Loving v. Virginia, 888 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (quoting Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943)). “[T]he imposition of special disabilities” upon a group of individuals based on “immutable characteristic[s] determined solely by the accident of birth,” like race and national origin, runs contrary to fundamental constitutional values enshrined in the Fifth and Fourteenth Amendments because it “violate[s] ‘the basic concept of our system that legal burdens should bear some relationship to individual responsibility.’ ” See Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion) (quoting Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972)). Accordingly, the Constitution forbids “[preferring members of any one group for no reason other than race or ethnic origin.” Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 307, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., concurring in judgment). Or, more simply, the Constitution prohibits “discrimination for its own sake.” Id.
Although religion, unlike race and national origin, is not an immutable characteristic, the Constitution treats classifications drawn on religious grounds as equally offensive. The First Amendment “mandates governmental neutrality between religion and religion, and between religion and nonreligion.” McCreary County v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)). To that end, the Constitution forbids both discriminating against “those who embrace[] one religious faith rather than another” and “preferring some religions over others—an invidious discrimination that would run afoul of the [Constitution].” United States v. Seeger, 380 U.S. 163, 188, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (Douglas, J., concurring).
If, as the Government’s argument implies, Congress delegated to the President the authority to deny entry to an alien or group of aliens based on invidious discrimination against a race, nationality, or religion, then Section 1182(f) would encroach on the core constitutional values set forth in the First, Fifth, and Fourteenth Amendments: The President could deny entry to aliens of a particular race solely based on the color of their skin. The President could deny entry to citizens of a particular nation solely on the basis of their place of birth. The President could deny entry to adherents of a particular religion solely because of their subscription to that faith. Or, as this Court concludes the President likely did here, the President could rely on one form of invidious discrimination—discrimination based on national origin—to serve as pretext for implementing another form of invidious discrimination—discrimination based on religion.
The President justified his use of this layered invidious discrimination on grounds that citizens of the six predominantly Muslim countries subject to the suspension on entry pose a special risk to United States security. Revised Order § 1(e). In particular, the Executive Order generally points to “the significant presence in each of these countries of terrorist organizations, their members, and others *619 exposed to those organizations.” Id. § 1(d). The order also cites, as the sole example of an act of terrorism by a native of one of the six countries, a native of Somalia who was brought to the United States as a refugee at the age of two and was convicted, as an adult, of “attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon.” Id. § 1(h).
Accordingly, the President relies on the acts of specific individuals and groups of individuals (i.e., “terrorist organizations” and “their members”) within the six countries to establish that all citizens of those countries pose a danger to the United States. Dissenting from the Supreme Court’s sanctioning of the forced internment of Japanese Americans during World War II, Justice Murphy explained the danger such rationales pose to the core constitutional value of equality:
[T]o infer that examples of individual [misconduct] prove group [misconduct] and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights. Moreover, this inference ... has been used in support of the abhorrent and despicable treatment of minority groups by the dictatorial tyrannies which this nation is now pledged to destroy. To give constitutional sanction to that inference ... is to adopt one of the cruelest of the rationales used by our enemies to destroy the dignity of the individual and to encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow.
Korematsu v. United States, 323 U.S. 214, 240, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (Murphy, J., dissenting).
To be sure, the Supreme Court has recognized that, particularly in times of war,[8] Congress has broad authority to control immigration, including the power to authorize the President to establish policies restricting the entry of aliens. See Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (stating that “the power to admit or exclude aliens is a sovereign prerogative” entrusted almost exclusively to Congress). And “in the exercise of its broad power over immigration and naturalization, ‘Congress regularly makes rules that would be unacceptable if applied to citizens.’ ” Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting Mathews v. Diaz, 426 U.S. 67, 80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)).
*620 But the Supreme Court also has long, and repeatedly, held that Congress’s power to create immigration laws remains “subject to important constitutional limitations.” Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491; see also, e.g., I.N.S. v. Chadha, 462 U.S. 919, 940-41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (“The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power.”); Chae Chan Ping v. United States, 130 U.S. 581, 604, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) (holding that Congress’s constitutionally devised powers to control immigration, among other powers, are “restricted in their exercise only by the constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations”). That is particularly true when the discriminatory burdens of an immigration policy fall not just on aliens who have no claim to constitutional rights, but also on citizens and other individuals entitled to constitutional protections. Cf. Zadvydas, 533 U.S. at 693-94, 121 S.Ct. 2491 (surveying the Supreme Court’s immigration jurisprudence and finding that whether a plaintiff alien could lay claim to constitutional protections “made all the difference”).
Here, aliens who are denied entry by virtue of the President’s exercise of his authority under Section 1182(f) can claim few, if any, rights under the Constitution. But when the President exercises that authority based solely on animus against a particular race, nationality, or religion, there is a grave risk—indeed, likelihood— that the constitutional harm will redound to citizens. For example, we hold today that the denial of entry to a class of aliens solely based on their adherence to a particular religion likely violates the Establishment Clause by sending “a state-sanctioned message that foreign-born Muslims ... are ‘outsiders, not full members of the political community.’ ” Ante at 584 (quoting Moss v. Spartanburg Cty. Sch. Dist. Seven, 683 F.3d 599, 607 (4th Cir. 2012)). Likewise, were the President to deny entry to a class of aliens solely based on then-race, citizens of that race would be subjected to a constitutionally cognizable “feeling of inferiority as to their status in the community.” Brown v. Bd. of Educ. of Topeka, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954). And denying entry to classes of aliens based on invidious discrimination has the potential to burden the fundamental right of citizens to marry the partner of their choice based on nothing more than the partner’s race, nationality, or religion.[9] Loving, 388 U.S. at 12, 87 S.Ct. 1817 (“There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause.”). Put simply, when the Government engages in invidious discrimination— be it against aliens or citizens—individuals whose rights the Constitution protects face substantial harm.
Because construing Section 1182(f) as authorizing the President to engage in invidious discrimination is plainly inconsistent with basic constitutional values and because the violation of those values implicates the rights of citizens and lawful per *621 manent residents, not just aliens, the Government’s proposed construction “raise[s] serious constitutional problems.” St. Cyr, 533 U.S. at 299-300, 121 S.Ct. 2271.
C.
Having concluded that the Government’s broad reading of Section 1182(f) raises serious constitutional concerns, we must reject that construction absent a “clear indication of congressional intent” to allow the President to deny the entry of classes of aliens on invidiously discriminatory bases. Zadvydas, 533 U.S. at 696-97, 121 S.Ct. 2491. And because Section 1182(f) involves a delegation of congressional authority, not a direct action by Congress, the indication of congressional intent to authorize the President, as delegatee, to encroach on fundamental rights must be “explicit.” Greene, 360 U.S. at 507, 79 S.Ct. 1400.
To ascertain congressional intent, we look to the “plain meaning” of Section 1182(f). Ross v. R.A. North Dev., Inc. (In re Total Realty Mgmt.), 706 F.3d 245, 251 (4th Cir. 2013). “To determine a statute’s plain meaning, we not only look to the language itself but also the specific context in which that language is used, and the broader context of the statute as a whole.” Id. (internal quotation marks omitted); see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (holding that in ascertaining congressional intent, courts “must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy” (internal quotation marks omitted)). Here, neither the language of Section 1182(f), nor the context in which the language is used, nor the “object and policy” underlying the Immigration Act “explicitly” state, much less “clear[ly] indicat[e],” that Congress intended to authorize the President to deny entry to aliens based on invidious discrimination.
1.
Beginning with the plain language, Section 1182(f) permits the President to suspend the entry of “any aliens or of any class of aliens” only when he “finds that the entry of [such aliens] would be detrimental to the interests of the United States.” Accordingly, the plain language of Section 1182(f) does not explicitly authorize the President to deny entry to a class of aliens solely defined by religion or by race, national origin, or other immutable characteristic.
Nonetheless, in arguing that Section 1182(f) authorizes the Executive Order’s suspension on entry, the Government focuses on that statute’s use of the (eon-cededly broad) term “any class of aliens.” Appellants’ Br. at 28-29. But the Government’s argument omits the crucial limitation Congress imposed by requiring that the President may bar entry only upon a finding that entry of a class of aliens “would be detrimental to the interests of the United States.” 8 U.S.C. § 1182(f). That restriction requires a substantive connection between an alien’s membership in a particular class and the likelihood that her entry would be detrimental to the interests of the United States.
Detrimental is defined as “harmful” or “damaging.” Webster’s Third New International Dictionary (2002). Accordingly, Section 1182(f) authorizes the President to deny entry to an alien if the President has reason to believe that, by virtue of the alien being a member of a particular class, her entry is more likely to damage or harm the interests of the United States. But the Constitution forbids imposing legal burdens on a class of individuals solely based on race or national origin precisely because those immutable characteristics *622 bear no “relationship to individual responsibility.” Weber, 406 U.S. at 175, 92 S.Ct. 1400. Because an alien’s race or national origin bears no “relationship to individual responsibility,” those characteristics, by themselves, cannot render it more likely that the alien’s entry will damage or harm the interests of the United States. Cf. Romer, 517 U.S. at 632, 636, 116 S.Ct. 1620 (holding that “a classification of persons undertaken for its own sake” is “inexplicable by anything but animus towards the class it affects[, has no] relationship to legitimate state interests,” and therefore violates the Fourteenth Amendment). Likewise, the Constitution’s prohibition on discriminating against “those who embrace[ ] one religious faith rather than another,” Seeger, 380 U.S. at 188, 85 S.Ct. 850 (Douglas, J., concurring), means that an alien’s adherence to a particular religion alone also provides no constitutionally cognizable basis for concluding that her entry is disproportionately likely to harm or damage the interests of the United States.
Because race, national origin, and religion bear no factual or constitutionally cognizable relationship to individual responsibility, courts have long interpreted delegation provisions in the Immigration Act as barring executive officials from engaging in invidious discrimination. For example, in United States ex rel. Kaloudis v. Shaughnessy, 180 F.2d 489 (2d Cir. 1950) (Hand, J.), the Second Circuit recognized “implied limitations” on Congress’s facially broad delegation of authority to the Attorney General to suspend the deportation of any alien unlawfully present in the country. 180 F.2d at 490. Writing for the court, Judge Hand suggested that denying suspension of deportation based on “irrelevant” reasons having no bearing on whether the “alien’s continued residence [was] prejudicial to the public weal”—such as “becoming] too addicted to attending baseball games, or hafving] bad table manners”—would exceed the Attorney General’s congressionally delegated authority. Id. Factors like these, Judge Hand explained, are “considerations that Congress could not have intended to make relevant” to a determination of whether an alien could permissibly remain in the United States.[10] Id. at 491 (emphasis added). Under the dictates of equality established by the Constitution, an alien’s race, nationality, or religion is as irrelevant to the potential for his entry to harm the interests of the United States as is the alien’s addiction to baseball or his poor table manners.
Judge Friendly made this point clear in Wong Wing Hang v. I.N.S., 360 F.2d 715 (2d Cir. 1966) (Friendly, J.). There, the Second Circuit again confronted a question regarding the scope of the Attorney General’s authority—delegated by Congress— to suspend an alien’s deportation. 360 F.2d at 716-17. Judge Friendly concluded that “the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group.” Id. at 719 (emphasis added). Like addiction to baseball and poor table manners, invidious discrimination is a “consideration!] that Congress could not have intended to make relevant” to decisions regarding whether to allow an alien residence in the United *623 States, Judge Friendly held. Id. (internal quotation marks omitted) (quoting Kaloudis, 180 F.2d at 491).
Just as Congress “could not have intended to make” considerations like “invidious discrimination against a particular race or group” relevant to the Attorney General’s discretionary decision to suspend an alien’s deportation from the United States, id., Congress “could not have intended to make” invidious discrimination relevant to the President’s discretionary determination regarding whether the entry of a particular alien or class of aliens is “detrimental to the interests of the United States,” 8 U.S.C. § 1182(f). That is because invidious discrimination has no connection to whether an alien’s residence in the United States would be harmful or damaging to the nation or its interests. Accordingly, not only does the plain language of Section 1182(f) fail to “explicitly” authorize the President to use invidious discrimination in determining whether to deny entry to a class of aliens, see Greene, 360 U.S. at 507, 79 S.Ct. 1400, it does not even provide a “clear indication” that Congress intended to delegate to the President the power to invidiously discriminate, see Zadvydas, 533 U.S. at 696-97, 121 S.Ct. 2491.
2.
Nor does the broader context of the Immigration Act, and Section 1182(f)’s place within it, suggest that Congress intended Section 1182(f) to allow the President to suspend the entry of a class of aliens based on invidious discrimination. In Section 1182(a), Congress enumerates numerous specific classes of aliens who are ineligible for visas or admission. These categories encompass, for example, classes of individuals who pose a variety of health, safety, and security risks, or are likely to become public charges. See generally 8, U.S.C. § 1182(a). Many of the categories are quite specific, providing particularized reasons why individual aliens may be deemed inadmissible. For example, aliens who have been convicted of certain crimes, served as foreign government officials and committed “particularly severe violations of religious freedom,” or participated in the commission of torture are inadmissible. 8 U.S.C. § 1182(a)(2)(A), (G); id. § 1182(a)(3)(E)(iii). Likewise, Section 1182(a) deems inadmissible aliens who have been members of a totalitarian or Communist party, abused their status as student visa holders, or “engaged in the recruitment or use of child soldiers.” Id. § 1182(a)(3)(D); id. § 1182(a)(6)(G); id. § 1182(a)(3)(G).
Importantly, most of the categories of inadmissible classes of aliens Congress sets forth in Section 1182(a) relate to past conduct by an alien that renders the alien particularly dangerous to the interests of the United States. E.g., § 1182(a)(2); § 1182(a)(3); § 1182(a)(6)(E); § 1182(a)(8)(B); § 1182(a)(9)(A). And, in accordance with Congress’s decision to define categories of inadmissible aliens largely based on individual conduct and responsibility rather than considerations over which aliens have no control, none of the Section 1182(a) categories render a class of aliens inadmissible solely on the basis of religion or of race, national origin, or other immutable characteristic.
Notwithstanding Congress’s enumeration of the many general and specific categories and classes of aliens that the executive branch may or must deem inadmissible—and its failure to include any category defined by race, national origin, or religion alone—the Government argues that, in enacting Section 1182(f), Congress delegated to the President the authority to deny entry to any class of aliens for any reason whatsoever, necessarily including for invidiously discriminatory reasons. Ap *624 pellants’ Br. at 28-29. But in construing a statutory provision, we must, if at all possible, avoid a construction “that would render another provision [in the same statute] superfluous.” Bilski v. Kappos, 561 U.S. 593, 607-08, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010). And reading Section 1182(f) as conferring on the President the unbridled authority to deny entry to any class of aliens would impermissibly render superfluous the numerous specific classes of inadmissible aliens that Congress has enumerated in Section 1182(a).
The District of Columbia Circuit reached an identical conclusion in Abourezk v. Reagan, 785 F.2d 1043 (D.C. Cir. 1986) (Ginsburg, J.). There, the court considered 8 U.S.C. § 1182(a)(27) (“Subsection (27)”), which required the Attorney General to exclude an alien if the Attorney General had reason to believe that the alien sought “to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest or endanger the welfare, safety, or security of the United States.” 785 F.2d at 1047 (internal quotation marks omitted) (quoting 8 U.S.C. § 1182(a)(27) (1982)). The question at issue was whether Subsection (27) allowed the Attorney General to “exclude aliens whose entry might threaten [United States’] foreign policy objectives simply because of their membership in Communist organizations,” id. at 1057, when an adjacent provision in the statute, 8 U.S.C. § 1182(a)(28) (“Subsection (28)”), specifically dealt with exclusion of aliens who were or previously had been members of any Communist party, Abourezk, 785 F.2d at 1048. Then-Judge (now Justice) Ginsburg concluded that reading the Attorney General’s vague and generalized delegated authority under Subsection (27) to allow exclusion on such a basis would impermissibly render Subsection (28) “superfluous.” Id. at 1057.
“To preserve the significance of both sections, and the congressional intent that guided their adoption,” the court held that the Attorney General could not rely on Subsection (27) to exclude aliens who were or had been members of a Communist party unless “the reason for the threat to the ‘public interest^] ... welfare, safety, or security’ ” that the Attorney General put forward as a basis for barring entry under Subsection (27) was “independent of the fact of membership in or affiliation with the proscribed organization.” Id. at 1058 (alterations in original) (quoting 8 U.S.C. § 1182(a)(27)). Put differently, the court prohibited the executive branch from using the general exclusionary authority conferred by Congress in Subsection (27) to circumvent the more specific provision in Subsection (28) dealing with exclusion of aliens affiliated with the Communist party. Id. at 1057-58.
For the same reason, the President’s reliance on Section 1182(f) as a basis for Section 2(c)’s suspension on entry also is inconsistent with Section 1182(a)(3)(B), which includes “specific criteria for determining terrorism-related inadmissibility.” See Kerry v. Din, — U.S. —, 135 S.Ct. 2128, 2140, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring). Recall that the Executive Order justified the President’s suspension on entry, in part, on grounds that certain nationals of the six countries were members of terrorist organizations or previously had engaged in acts of terrorism and, therefore, that admitting aliens from those countries would be detrimental to the interests of the United States. See supra Part I.B.
Section 1182(a)(3)(B) renders inadmissible aliens who have been, are, or may in the future be connected to or engaged in terrorist activity, including aliens who have “engaged in a terrorist activity”; those whom government officials know or have *625 reasonable cause to believe are “likely to-engage after entry in any terrorist activity”; those who have “incited terrorist activity”; and those who “endorse[] or espouse[] terrorist activity or persuade[] others to” do so or who “support a terrorist organization.” 8 U.S.C. § 1182(a)(3)(B)(i). That subsection also provides detailed definitions of “terrorist activity,” “terrorist organization,” the act of “engag[ing] in terrorist activity,” and “representative” of a terrorist organization. Id. § 1182(a)(3)(B)(iii)—(vi).
Congress established these “specific criteria for determining terrorism-related inadmissibility,” Din, 135 S.Ct. at 2140, against the backdrop of the executive branch’s exclusion of aliens based on “mere membership in an organization, some members of which have engaged in terrorist activity” even when there was no indication that the alien seeking admission was himself engaged in such activity. H.R. Rep. No. 100-882, at 19 (1988). By enacting specific provisions regarding the inadmissibility of aliens who are or have been engaged in terrorist activity, Congress sought to make clear that “the definitions of ‘terrorist activity’ and ‘engages in terrorist activity’ must be applied on a case by case basis” and that “simple membership in any organization ... is not per se an absolute bar to admission to the United States”—whether under the President’s general authority to bar entry or otherwise. Id. at 80.
If Congress has deemed it unlawful for the President to absolutely bar the entry of aliens who are members of an organization that includes some members who engage in terrorism, it defies logic that Congress delegated to the President in Section 1182(f) the far broader power to absolutely bar the entry of aliens who happen to have been bom in a particular country, within the borders of which some individuals have engaged in terrorism. Indeed, this is precisely why courts apply the canon of statutory construction “that the specific governs the general.” RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) (internal quotation marks omitted). When, as here, a statute includes “a general authorization [Section 1182(f) ] and a more limited, specific authorization [Section 1182(a)(3)(B) ] ... side-by-side” that canon requires that “[t]he terms of the specific authorization must be complied with” in order to avoid “the superfluity of a specific provision that is swallowed by the general one.” Id. Accordingly, Section 1182(a)(3)(B), not Section 1182(f), is the eongressionally authorized mechanism for the President to deny entry to aliens whom he concludes are detrimental to the United States because they pose a threat of engaging in terrorist activities. See Abourezk, 785 F.2d at 1049 n.2 (“The President’s sweeping proclamation power [under Section 1182(f) ] thus provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the categories in section 1182(a).” (emphasis added)).
Interpreting Section 1182(f) to allow the President to suspend the entry of aliens based solely on their race, nationality, or other immutable characteristics also would conflict with 8 U.S.C. § 1152(a), which provides that “no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person’s race, sex, nationality, place of birth, or place of residence.” Congress passed Section 1152(a) in 1965, more than a decade after it enacted Section 1182(f), as part of a comprehensive revision to the Immigration Act intended to eliminate nationality-based discrimination in the immigration system. See infra Part I.C.3.
*626 Section 1152(a) deals with issuance of immigrant visas, rather than entry, which is governed by Section 1182. Nonetheless, reading Section 1182(f) as authorizing the President to deny entry based on invidious discrimination would place Section 1182(f) in conflict with Section 1152(a), which prohibits invidious discrimination in the issuance of visas. In particular, the Immigration Act authorizes the executive branch to refuse to issue a visa to any alien who “is ineligible to receive a visa or such other documentation under section 1182.” 8 U.S.C. § 1201(g). As the Government concedes, the President’s exercise of his authority under Section 1182(f) to deny entry to aliens from the six predominantly Muslim countries, were it lawful, also would bar, by virtue of Section 1201(g), such aliens from obtaining visas, including immigrant visas. This would be the very result Congress sought to avoid in ending nationality-based discrimination in the issuance of immigrant visas through its passage of Section 1152(a).
Accordingly, Section 1182(f)’s function within the Immigration Act does not clearly indicate that Congress intended to delegate to the President the authority to suspend the entry of aliens based on invidious discrimination. On the contrary, construing Section 1182(f) as broadly authorizing the President to engage in invidious discrimination in denying entry would render superfluous the numerous categories of inadmissible aliens Congress took pains to identify in Section 1182(a), including the provisions directly addressing aliens who pose a risk of engaging in terrorist activities, and conflict with Section 1152(a)’s prohibition on discrimination based on race, nationality, and other immutable characteristics.
3.
Reading Section 1182(f) as allowing the President to deny entry to classes of aliens based on invidious discrimination also would contradict the “object and policy” underlying the Immigration Act. See U.S. Nat’l Bank of Or., 508 U.S. at 455, 113 S.Ct. 2173. Although the specific language of Section 1182(f) dates to 1952, Congress “comprehensively] revis[ed]” the Immigration Act in 1965 (the “1965 Revisions”). S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2, 88th Cong. 78 (1964) (statement of Sen. Fong). Those revisions were drafted concurrently with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 and enacted at the height of the civil rights movement with the express purpose of “eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States.” H.R. Rep. No. 89-745, at 8 (1965); see also S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 3, 88th Cong. 107 (1964) (statement of Sen. Hart) (“A law that says that one man is somewhat less than another simply because of accident of his place of birth is not tolerable in the year 1964. A formula based on equality and fair play must be enacted. Selection should be based primarily on questions of our own national interest.”).
Prior to the 1965 Revisions, the Immigration Act employed nationality-based quotas, limiting the number of immigrants admissible to the nation each year based on nation of birth. President Kennedy called on Congress to repeal the nationality-based quota system, condemning it as a system “without basis in either logic or reason” that “neither satisfie[d] a national need nor accomplished an international purpose” but instead “discriminated among applicants for admission into the United States on the basis of accident of *627 birth.” Letter to the President of the Senate and to the Speaker of the House on Revision of the Immigration Laws, 1963 Pub. Papers 594, 595 (July 23, 1963). After President Kennedy’s assassination, President Johnson renewed Kennedy’s request for “the elimination of the national origins quota system,” which he described as “incompatible with our basic American tradition” and “our fundamental belief that a man is to be judged—and judged exclusively—on his worth as a human being.” Special Message to the Congress on Immigration, 1965 Pub. Papers 37, 37, 39 (Jan. 13,1965).
The 1965 Revisions answered President Kennedy’s and President Johnson’s calls. Congress explained that the 1965 Revisions abolished nationality-based discrimination in the immigration system in order to “firmly express in our immigration policy the dedication which our nation has to the principles of equality, of human dignity, and of the individual worth of each man and woman.” S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 1, 88th Cong. 4 (1964) (statement of Sen. Kennedy). Time and again Congress connected the need to eliminate the nationality-based quota system to American “tenets of equality irrespective of race, creed, or color” and emphasized that abolishing nationality-based quotas “demonstrat[ed] to the whole world that we practice what we preach, and that all men are equal under law.” S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Sub-comm. on Immigration & Naturalization Vol. 2, 88th Cong. 100-01 (1964) (statement of Sen. Fong); see also id. Vol. 1, at 9 (statement of Sen. Hart) (explaining that the 1965 Revisions abolished the “irrational ... national origins concept, which said in clear and echoing words that the people of some nations [we]re more welcome to America than others” based on “[ajrbitrary ethnic and racial barriers”)..
Upon signing the bill into law at Liberty Island, New York, President Johnson lauded the end of the nationality-based discrimination that previously defined the American system of immigration, describing the 1965 Revisions as abolishing “the harsh injustice of the national origins quota system,” which “violated the basic principle of American democracy—the principle that values and rewards each man on the basis of his merit as a man.” 1965 Pub. Papers 1037, 1038-39 (Oct. 3, 1965). As a result of the 1965 Revisions, immigrants would be permitted to come to America “because of what they are, and not because of the land from which they sprung.” Id. at 1039 (emphasis added).
To effect its purpose of eliminating discrimination in the immigration system, Congress stripped the Immigration Act of all provisions expressly authorizing national origin-based invidious discrimination and added Section 1152(a)(1)’s prohibition on discrimination in the issuance of visas based on nationality and other immutable characteristics, such as race. As evidenced by Section 1152(a)(1), disregarding national origin in selecting which immigrants to admit to the United States remains a core principle of United States immigration policy. Far from evidencing “any clear indication” that Congress intended the President to have the authority to exercise his Section 1182(f) powers based on invidious discrimination, the “object and policy of the Immigration Act suggest that Congress did not intend to grant the President unbridled authority to engage in invidious discrimination when deciding whether and to what extent to suspend alien entry.[11]
*628 * * * * *
In sum, the language of Section 1182(f), related provisions in the Immigration Act, and the “object and policy” of the statute do not “explicitly” state, much less provide a “clear indication,” that Congress intended to delegate to the President wholly unconstrained authority to deny entry to any class of aliens, including based on invidiously discriminatory reasons. See Zadvydas, 533 U.S. at 697, 121 S.Ct. 2491. Accordingly, Section 2(c)—which this Court finds was likely borne of the President’s animus against Muslims and his intent to rely on national origin as a proxy to give effect to that animus—exceeds the authority Congress conferred on the President in Section 1182(f). As Judge Friendly put it, “Congress could not have intended to make relevant” to the President’s exercise of his delegated authority to suspend the entry of aliens “invidious discrimination against a particular race or group.” Wong Wing Hang, 360 F.2d at 719 (internal quotation marks omitted).
II.
Invidious “discrimination in any form and in any degree has no justifiable part whatever in our democratic way of life. It is unattractive in any setting but it is utterly revolting among a free people who have embraced the principles set forth in the Constitution of the United States.” Ko *629 rematsu, 323 U.S. at 242, 65 S.Ct. 193 (Murphy, J., dissenting). Yet the Government asks this Court to hold that, in enacting Section 1182(f), Congress intended to delegate to the President the power to deny entry to a class of aliens based on nothing more than such aliens’ race, national origin, or religion.
One might argue, as President Trump seemed to suggest during the campaign, ante at 574-76, that as a matter of statistical fact, Muslims, and therefore nationals of the six predominantly Muslim countries covered by the Executive Order, disproportionately engage in acts of terrorism, giving rise to a factual inference that admitting such individuals would be detrimental to the interests of the United States. Indeed, viewing the Executive Order in its most favorable light, that is precisely the rationale underlying Section 2(c). Setting aside the question of whether that factual finding is true, or even reasonable—which is, at best, highly debatable given the 180 million people in the countries subject to the suspension on entry and the 1.6 billion Muslims worldwide—that is precisely the inference that the Framers of the Constitution and the Reconstruction Amendments concluded was impermissible as a matter of constitutional law.[12] Korematsu, 323 U.S. at 240, 65 S.Ct. 193 (Murphy, J., dissenting). In particular, classifying individuals based solely on their race, nationality, or religion—and then relying on those classifications to discriminate against certain races, nationalities, or religions—necessarily re-suits in placing special burdens on individuals who lack any moral responsibility, a result the Framers deemed antithetical to core democratic principles and destabilizing to our Republic. Id.
Even though the Constitution affords greater latitude to the political branches to draw otherwise impermissible distinctions among classes of aliens, the harm to core constitutional values associated with governmental sanctioning of invidious discrimination—and the harm to citizens stemming from the abridgement of those values—demands evidence of “careful and purposeful consideration by those responsible for enacting and implementing our laws” before such discrimination should be sanctioned by the judiciary. Greene, 360 U.S. at 507, 79 S.Ct. 1400 (emphasis added). Because Congress did not provide any indication—let alone the requisite “explicit” statement—that it intended to delegate to the President the authority to violate fundamental constitutional values of equality in exercising his authority to deny entry to classes of aliens, I reject the Government’s proposed construction' of Section 1182(f).
In emphasizing the larger constitutional problems raised by construing Section 1182(f) as a delegation of authority to engage in invidious discrimination, we must not forget that the Constitution embraces equality in order to forestall highly personal harms. Plaintiff John Doe #1, a lawful permanent resident, seeks to be reunited with his wife, an Iranian national, whom *630 Section 2(c) bars from entering the United States. As Justice Jackson explained when confronted with another broad delegation of congressional authority over immigration, “Congress will have to use more explicit language than any yet cited before I will agree that it has authorized [the President] to break up the family of [a lawful permanent resident] or force him to keep his wife by becoming an exile.” Knauff, 338 U.S. at 551-52, 70 S.Ct. 309 (Jackson, J., dissenting).

. The answer to the rhetorical question of whether the President will be able to “free himself from the stigma” of his own self-inflicted statements, post at 659, lies in deter *613 mining whether the Executive Order complies with the rule of law. That requires us to consider, in each instance, how the character, temporality, and nature of the President's repeated, public embrace of an invidiously discriminatory policy offensive to the Constitution bear on a challenged policy.

. It strains credulity to state that “the security of our nation is indisputably lessened as a result of the injunction.” Post at 659 (emphasis added). Rather, the district court's order only enjoined implementation of Section 2(c) of the Executive Order—a provision that the President maintained would increase national security. Indeed, two reports released by the Department of Homeland Security in February 2017 and March 2017 found that citizenship is an "unlikely indicator” of whether an individual poses a terrorist threat to the United States and that most of the individuals who have become U.S.-based violent extremists have been radicalized after living in the United States for a period of years. J.A. 233. The Government has not provided any information suggesting, much less establishing, that the security risks facing our country are any different today than they were when the President first sought to impose this temporary ban only seven days into his presidency.

. Kent v. Dulles, 357 U.S. 116, 129-30, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

. Romer v. Evans, 517 U.S. 620, 636, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

. Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

. Zadvydas v. Davis, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

. The Government also asserts that Section 2(c)'s suspension on entry is authorized by Section 1185(a) of the Immigration Act, which "authorizes the President to prescribe ‘reasonable rules, regulations, and orders,' as well as 'limitations and exceptions,’ governing the entry of aliens.” Appellants' Brief at 29 (quoting 8 U.S.C. § 1185(a)). The Government does not argue that Sections 1182(f) and 1185(a) confer meaningfully different powers on the President. Because Section 1182(f) is specifically tailored to the suspension on entry, and because there is no reason to believe that the analysis would be different under Section 1185(a), my analysis will proceed under Section 1182(f).
Additionally, because the Executive Order cites the Immigration Act as the sole statutory basis for the President’s authority to proclaim Section 2(c)'s suspension on entry, I need not, and thus do not, take any position on the scope of the President’s delegated power to deny entry to classes of aliens under other statutes. Likewise, because the claim at issue relates only to Section 2(c)’s compliance with the Immigration Act, I do not address whether, and in what circumstances, the President may deny entry to classes of aliens under his inherent powers as commander-in-chief, even absent express congressional authorization. See The Prize Cases, 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1862).
Finally, I agree with Judge Keenan’s analysis and conclusion that, at a minimum, John Doe #1 has standing to pursue Plaintiffs’ Immigration Act claim. Ante at 606-07.

. Congress’s constitutional power to control immigration—and authority to delegate that control—fundamentally differs in a time of war. Korematsu v. United States, 323 U.S. 214, 224, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (Frankfurter, J., concurring) ("[T]he validity of action under the war power must be judged wholly in the context of war. That action is not to be stigmatized as lawless because like action in times of peace would be lawless."). The Supreme Court’s broadest statements regarding the scope of the President’s delegated powers over immigration— which are relied upon by the Government— are in cases in which Congress expressly declared war and authorized the President to deny entry to aliens as part of his prosecution of the conflict. See, e.g., Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210 & n.7, 73 S.Ct. 625, 97 L.Ed. 956 (1953) ("Congress expressly authorized the President to impose additional restrictions on aliens entering or leaving the United States during periods of international tension and strife [including] the present emergency [the Korean War].” (emphasis added)); Knauff, 338 U.S. at 543, 70 S.Ct. 309 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power, e.g., as was done here, for the best interests of the country during a time of national emergency [World War II].” (emphasis added)).

. See Kerry v. Din, — U.S. —, 135 S.Ct. 2128, 2142, 192 L.Ed.2d 183 (2015) (Breyer, J., dissenting) (stating that a United States citizen and resident has a procedural due process interest in knowing the Government's grounds for denying a visa application by her husband, an Afghan citizen with no claim to rights under the Constitution); id. at 2139 (Kennedy, J., concurring in judgment) (recognizing that a United States citizen may have “a protected liberty interest in the visa application of her alien spouse”).

. Notably, Kaloudis found a basis for this clear outer limit on congressional delegations of discretionary authority to the executive branch in the Immigration Act well before Congress made explicit, in comprehensively amending the Immigration Act, that discrimination on the basis of race, sex, ethnicity, and nationality has no place in controlling immigration. See infra Part I.C.3.

. The Government points to a number of orders promulgated by Presidents pursuant to *628 their authority under Section 1182(f) as evidence that that statutory provision authorizes the President to engage in national origin-based discrimination. But the previous orders the Government cites materially differ from Section 2(c), in that they did not suspend the entry of classes of aliens based on national origin alone, let alone use national origin as a proxy to suspend the entry of a class of aliens based on another invidiously discriminatory basis, such as religion. See Proclamation 8693 (July 24, 2011) (suspending the entry of aliens subject to travel bans issued by the United Nations Security Council's resolution barring member nations from permitting the entry of individuals who threaten peace in various nations); Proclamation 8342 (Jan. 22, 2009) (suspending the entry of senior government officials "who have impeded their governments’ antitrafficking efforts, have failed to implement their governments’ antitrafficking laws and policies, or who otherwise bear responsibility for their governments' failures to take steps recognized internationally as appropriate to combat trafficking in persons”); Proclamation 6958 (Nov. 22, 1996) (suspending the entry of "members of the Government of Sudan, officials of that Government, and members of the Sudanese armed forces” based on the Sudanese government’s harboring of individuals who attempted to assassinate the Egyptian President in Ethiopia, in violation of Ethiopian sovereignty); Executive Order No. 12,807 (May 24, 1992) (suspending the entry of "undocumented aliens. [entering the United States] by sea” during the mass exodus of Haitian nationals fleeing a military coup, often in dangerous and overcrowded sea vessels); Proclamation 5887 (Oct. 22, 1988) (suspending the entry of “officers and employees” of the Nicaraguan government as nonimmigrants to the United States based on the Nicaraguan government’s "unjustified expulsion” of American diplomats and "longstanding ... suppression of free expression and press and support of subversive activities throughout Central America”); Proclamation 5829 (June 10, 1988) (suspending the entry of "Panamanian nationals ... who formulate or implement the policies of Manuel Antonio Noriega and Manuel Solis Palma” due to those officials’ act of "preventing the legitimate government ... from restoring order and democracy” to Panama).
Of the executive orders cited by the government, President Reagan’s suspension on the entry of Cuban nationals as immigrants comes closest to a nationalily-based suspension on alien entry. Proclamation 5517 (Aug. 22, 1986). But that executive action was not challenged as a violation of either Section 1182(f) or Section 1152(a)(1), and therefore the judiciary never had the opportunity to address whether the order complied with those provisions or the Constitution. Nor does a single, unchallenged executive action "demonstrate the kind of consistent administrative interpretation necessary to give rise to a presumption of congressional acquiescence.” Abourezk, 785 F.2d at 1056.

. Our country adheres to the rule of law in preserving core constitutional protections. Thus, when the President can identify no change in circumstances justifying an invidious encroachment on constitutional rights, a simple claim of potential harm to national security does not provide the President with unfettered authority to override core constitutional protections. See New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (holding that a claim of potential harm to national security does not provide the executive branch with unconstrained authority to override the freedom of the press). Indeed, even the invocation of Congressional war powers to protect national defense do "not remove constitutional limitations safeguarding essential liberties.” Robel, 389 U.S. at 264-67, 88 S.Ct. 419 (internal quotation marks omitted).